**SKY TRANSPO, INC., Appellee,**

v.

**CITY OF KNOXVILLE, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Dec. 30, 1985.

Courtney N. Pearre, Louis Hofferbert, Knoxville, for appellant.

H. Rowan Leathers, Asst. Atty. Gen., W.J. Michael Cody, Atty. Gen. & Reporter, for amicus Com'r of Revenue.

G. Wendell Thomas, Jr., Gail M. Good, Kennerly, Montgomery & Finley, Knoxville, for appellee.

## OPINION

FONES, Justice.

Plaintiff, Sky Transpo, which owned and operated the gondola and chair lift system at the 1982 World's Fair, initiated this action in the Chancery Court of Knox County, Tennessee seeking a refund of taxes paid the City of Knoxville under protest. The trial court concluded that the City properly imposed the taxes and that plaintiff was not entitled to recover. The Court of Appeals reversed and rendered judgment for plaintiff for the amounts paid under protest plus interest from the date of payment. The City of Knoxville appealed to this Court pursuant to Rule 11, T.R.A.P.

This case presents two issues for review: (1) whether plaintiff's system was an "amusement" within the meaning of Chapter 776, Private Acts of 1947, which provides for "... a tax of one (1) cent for each (20) cents, or major fraction thereof, on the amount paid for admission to any place of amusement ...", and (2) in the event plaintiff's system is found not to be an "amusement" within the meaning of the Act, whether plaintiff paid the taxes at issue involuntarily.

Pursuant to a contract between plaintiff and fair management, Knoxville International Energy Exposition [KIEE], plaintiff was granted an exclusive license to operate the "1982 World's Fair Aerial Transportation System," which is the term used in the contract. Plaintiff contends that its system was, in fact, a transportation system rather than an amusement, and, as such, not subject to the admissions tax.

Testimony established that KIEE had originally contemplated an overhead amusement ride 700 feet in length, consisting of 22 two-person chairs. However, when Stokely Van Camp, the sponsor of the fair's Folklife Festival, conditioned its participation in the fair upon the existence of a system to transport people to its proposed exhibit atop a steep hill, KIEE modified its plans. The resulting system consisted of a gondola ride from one end of the grounds to a point near the center of the mile-long, linear fair site, and a second ride, a chair lift, from the middle of the grounds to a point half-way toward the other end of the grounds. The system was over 2,800 feet long and carried approximately 4,600 passengers per hour.

Originally, plaintiff's ride was scheduled to run only during the hours the fair exhibits were open, from 10:00 a.m. to 10:00 p.m. However, when KIEE revised its plans in response to Stokely Van Camp's wishes, it also changed plaintiff's hours of operation to 9:00 a.m. to 12:00 midnight, requiring plaintiff to accommodate fair employees and visitors entering and leaving the grounds as early as an hour before the pavilions opened and as late as two hours after the pavilions closed. The various international participants in the fair were provided with free passes to plaintiff's system to facilitate the movement of their pavilion employees across the fair site.

With the exception of motorized wheelchairs provided for handicapped persons, there was no means of ground transportation at the fair. Early plans for a tram had been abandoned when it was determined that the fair site was too narrow to accommodate a surface system. It further appears that the purchase of a coupon book containing admission tickets to the fair's amusement rides did not enable a fair visitor to board plaintiff's system; the gondola and chair lift were expressly distinguished from the amusement area denominated the "Family Fun Fair."

In addition, plaintiff paid its employees the federal minimum wage, although it had been advised that amusement rides were not subject to the federal minimum wage law. Testimony indicated, as well, that access to the system was denied to only one person during the course of the fair—a severely handicapped individual whose un-

usually heavy wheelchair could not be lifted onto the ride.

## I.

In light of the foregoing facts, we conclude that plaintiff's gondola and chair lift were primarily means of transportation rather than amusements within the meaning of Chapter 776, Private Acts of 1947. Plaintiff, therefore, is not subject to the 5% admissions tax imposed by the Act.

■ We adhere to the rule that "tax statutes are to be liberally construed in favor of the taxpayer and strictly construed against the taxing authority." *White v. Roden Electrical Supply Co., Inc.*, 536 S.W.2d 346, 348 (Tenn.1976). We are not persuaded by the City's argument that the Sky Transpo system was primarily an amusement because it provided passengers with an entertaining vantage point from which to view the fair below. We agree with the Court of Appeals that

> "[i]n the case at bar sight-seeing [was] not the ostensible purpose for which tickets were purchased. In the first place, the majority of one's view consisted of people, many of whom were standing in line waiting to enter a pavilion. The principal and interesting sights to be seen were those displayed inside the various national pavilions."

We likewise reject the City's argument that the system's location should be the determinative criterion. Plaintiff's gondola and chair lift rides were admittedly situated wholly within the confines of the World's Fair grounds, but we do not consider this factor to be controlling.

In support of its contention that the Sky Transpo system was an amusement, the City points to the fact that plaintiff's rides were dismantled and removed from the site after the fair ended. This fact, however, leads us with equal logic to a conclusion adverse to that espoused by the City. It seems self-evident that a transportation system could not feasibly be operated after the public need for it had ceased.

■ In this Court, the city makes a new argument based upon the classification of places of amusement pursuant to Chapter 13, Public Acts 1984, codified as T.C.A. § 67–6–102(14)(E), effective June 1, 1984. What the Tennessee Legislature chose to tax as amusements in 1984 has no bearing or persuasive force upon the interpretation of a private tax act passed in 1947 as applied to alleged taxable events that occurred in 1982. The trial of this case preceded the 1984 Act. It is elementary that cases are to be tried upon the facts and the law existing at the time of the trial.

■ The City also contends that T.C.A. § 68–19–101, which defines "aerial passenger tramways" as "recreation transportation of passengers," and T.C.A. § 68–48–105, which states that a passenger tramway "shall be deemed not to be a common carrier," should have some bearing on the case at bar. Both sections, however, are part of legislation intended to address public safety concerns. We find it neither appropriate nor persuasive to read into Chapter 776 of the Private Acts of 1947 definitions from an entirely unrelated statutory scheme. *See United States Fidelity & Guaranty Co. v. Thompson & Green Machinery Co., Inc.*, 568 S.W.2d 821 (Tenn. 1978); *Parkridge Hospital, Inc. v. Woods*, 561 S.W.2d 754 (Tenn.1978); *White Stores, Inc. v. Atkins*, 202 Tenn. 180, 303 S.W.2d 720 (1957).

## II.

■ The second issue is whether plaintiff paid the tax under duress and involuntarily, a prerequisite to recovery.

It was stipulated that on June 16, 1982, Charles W. Swanson, Knoxville's Assistant City Attorney, sent a letter on behalf of the City's Law Department, to Maurice DuBois of Sky Transpo, Inc. The letter stated in part:

> [A]s the operator of an amusement within the meaning of the above-referenced Act, your firm is responsible for the collection and payment of the amusement tax to the City. The first such payment is due on or before July 10, 1982 (for

taxes accrued during the period June 1–30, 1982) and subsequent payments due on the 10th day of each month thereafter. ...

Please make every effort to pay this tax promptly as the failure to do so will result in the addition of penalty and interest at a rate of 2% compounded monthly. Additionally, for the purpose of enforcing the payment of the tax under this Act, the tax collector is authorized to avail himself of the process of distraint in those cases where the tax remains unpaid following the due date.

The letter also included a copy of the Admissions Tax Act, which provides, in § 5, that:

Every person making such return shall, at the time of making the return, pay the amount of taxes shown thereby to the tax collector. If the tax imposed by this Act is not paid when due, there shall be added as a part of the tax, interest and penalty at the rate of two (2%) per cent per month from the time the tax became due and until paid.

The Act, in § 7, further provides for the imposition of criminal penalties for failure to pay the admissions tax:

Any person charged by this Act with the duty of collecting or paying the taxes hereby imposed who willfully fails or refuses to charge and collect or to pay such taxes, or to make the reports and returns required hereunder, or to permit the tax collector or his duly authorized agent to examine his books and other records for the purpose of verifying any return or report or payment pursuant to this Act, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined not less than Twenty-Five ($25.00) Dollars, nor more than One Thousand ($1,000.00) Dollars, and upon conviction of a second or other subsequent offenses shall be fined not less than One Hundred ($100.00) Dollars, nor more than Two Thousand ($2,000.00) Dollars, and imprisoned, in the discretion of the Court, in the County jail or workhouse for not more than three months, or both. In case of violations by a corporation, the officers or directors responsible for such violation shall be subject to the punishment provided herein upon proper indictment.

It was also stipulated that Sky Transpo made five admissions tax payments to the City of Knoxville, each time marking its check and the accompanying tax return and letter, "under protest." Likewise, each tax receipt bore the words "under protest."

In *Stroop v. Rutherford County*, 567 S.W.2d 753, 756 (Tenn.1978), taxpayers alleged that they had presented deeds for registration at the Rutherford County Register's Office and registration was refused unless and until a special realty transfer tax was paid; that they were compelled to and did pay the illegal tax in order to protect their property interests. We held that those allegations sufficiently alleged that the taxes in question were paid under duress and compulsion and not voluntarily. Mr. Justice Brock, writing for the Court, reviewed the leading cases in Tennessee and our sister states bearing upon the issue of payment of taxes involuntarily and under duress, and refined the principles to be applied in adjudicating that issue.

We think the following quotes from *Stroop* are particularly applicable to the facts of this case:

It has been aptly said that the terms "voluntary" and "involuntary," when used with reference to the payment of taxes, are not applied in their ordinary sense. [citations omitted] Thus, with respect to the payment of taxes, it has been recognized that a payment may be voluntary although it is made unwillingly and, on the other hand, it is held that it is not necessary for the taxpayer to be subject to physical force or that his volition be actually overridden in order that a payment may be deemed involuntary. 567 S.W.2d at 756.

. . . . .

"... [T]he trend is toward greater liberality in recognizing the implied duress under which payment of a tax is almost always made, and even when no seizure

of the taxpayer's goods is imminent, if he is put at a serious disadvantage in the assertion of his legal rights in defending proceedings brought to collect the tax, justice may require that he be at liberty to avoid this disadvantage by paying promptly and bringing suit on his own side. He is entitled to assert his supposed right on reasonably equal terms." [citation omitted]

"In order for a payment of taxes to be deemed involuntary, there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment, over the person or property of the party making the payment, from which the latter has no reasonable means of immediate relief except by making the payment. But, in order to render such a payment involuntary, it is not necessary that there be any technical duress, in the usual sense of the term. Rather, in determining whether a payment of taxes is voluntary or involuntary, the real question is whether there was such an immediate and urgent necessity for the payment as to imply that it was made under compulsion." 567 S.W.2d at 756–57, *quoting with approval from* 72 Am. Jur.2d 343 *State and Local Taxation* § 1081 (1974).

The following from *Bell v. Clay County,* 168 Tenn. 6, 73 S.W.2d 685 (1934) is particularly applicable to the instant case, and was relied upon in *Stroop:*

"An illegal tax wrongfully collected by a county may be recovered, if paid under duress sufficient to create an urgent and immediate necessity. ...
The payment of a sum of money to avoid the hazard of a disproportionately larger sum is sometimes treated as an involuntary payment, made under duress, so that a suit to recover the sum paid may be maintained." 168 Tenn. at 8–9, 73 S.W.2d at 685–86.

The June 16, 1982 letter warned plaintiff that in the event it became delinquent in its admissions tax payments, the City was empowered to utilize the process of distraint to seize the gondola and chair lift system. Such a seizure would have placed plaintiff in breach of its contract with KIEE, and would have entitled KIEE to terminate the agreement and revoke plaintiff's license to operate the system. Plaintiff was therefore faced with the possibility that it would suffer the loss of its financial investment in the system and that it would incur liability for damages to KIEE if it failed to make timely payments of the taxes the City claimed it owed. Had the City proceeded to avail itself of the summary remedy of distraint, plaintiff would have had no opportunity to interpose its defenses in an action at law prior to the seizure of its system. It thus appears that plaintiff was at a serious disadvantage in the assertion of its legal rights, in that it had no reasonable means of immediate relief except by making the payments. It is our opinion that one who denies the legality of a tax should be at liberty to avoid this disadvantage by paying the disputed tax promptly and bringing suit to recover what he has paid under protest.

Finally, we observe that the Act makes willful failure to pay the admissions tax a misdemeanor for which fines and imprisonment may be imposed. We held on similar facts in *Jorgensen-Bennett Mfg. Co. v. Knight,* 156 Tenn. 579, 3 S.W.2d 668 (1928), that the existence of such sanctions gives rise to an element of duress. We are of the opinion that a taxpayer need not risk the imposition of criminal penalties in order to preserve his right to pay the disputed tax under protest and maintain an action for its recovery.

Upon these facts we find that plaintiff's tax payments were compelled by "an immediate and urgent necessity." *Stroop v. Rutherford County, supra.,* at 757. Sky Transpo is therefore entitled to recover the amounts paid under protest with interest as provided by law from the date of payment. The judgment of the Court of Appeals is affirmed and the cause is remanded to the trial court for a determination of the amount due plaintiff. Costs are adjudged against the City of Knoxville.

COOPER, C.J., and BROCK, J., concur.

HARBISON and DROWOTA, JJ., concur in part, dissent in part.

HARBISON, Justice, concurring in part and dissenting in part.

I concur with the conclusion of the majority opinion that the tax in question was sufficiently paid under protest to justify the maintenance of this action.

I also agree that the gondola and chair lift system at the 1982 World's Fair served incidentally as a transportation system for a few employees and as a means for patrons of the fair to move from one place to another. The system, however, was designed to accommodate 4,480 persons per hour and was an integral part of the amusement facilities at the 1982 World's Fair. In my opinion the Chancellor correctly concluded that the function of this system as a "transportation system" as distinguished from a "place of amusement" was incidental almost to the point of being *de minimis*, and that its overwhelmingly primary purpose was for amusement and entertainment.[1]

I agree with the conclusions of the Chancellor as follows:

· "The rides did provide transportation between distant points of the Fair Grounds, and provided to an extent a means for disabled persons to get about the Grounds especially providing them access to the Folklife area which was atop a hill, by the gondola ride, which had one of its terminals there. However, the rides provided just that, rides for those enjoying the Fair, a past time, (*sic*) and thus an amusement. The rides also provided an overview of large portions of the Fairgrounds, and therefore were entertaining [Citation omitted]. The entire Fair was certainly a place of amusement, and the rides operating from one place to another all within that place of amusement were thus themselves part of, and themselves a place of amusement. The

fact that while providing an amusement within a place of amusement the rides also transported the riders from one place to another within the place of amusement does not change the character of the rides from being themselves a place of amusement within the meaning of the taxing statute. Put another way, even viewing the rides as transportation, they were also taxable places of amusement under the circumstances."

Filed as Exhibit 2 in the record was the lease agreement between the Knoxville International Energy Exposition and the taxpayer, Sky Transpo. The contents of this document, in my opinion, are quite revealing as to the intentions and understandings of the parties themselves.

The agreement executed in September, 1981 (about eight months before the Fair opened), stated that the lessee, Sky Transpo, desired to construct and maintain "a concession" for a specific term, to end on December 31, 1982, removal of the improvements to commence in November 1982. Section 3 of the Agreement of Lease called the project a "Chairlift and/or Gondola" and sometimes referred to it as a "Concession." Lessee was to be responsible for appropriate "signage and graphics", and Section 3(b) provides in part:

"Lessee shall provide as approved by the KIEE Design Review Board thematic treatments of the themed rides and attractions to compliment (*sic*) The 1982 World's Fair theme and design."

In Section 3(c) the lessee was given the right and obligation as part of its operation to sell the Stokely Van-Camp product "Gatorade" from a portable cart or carts or from other units supplied by the lessee and approved by the Knoxville International Energy Exposition, this product to be sold in such manner at all times when the gondola was in operation. The section provides: ·

---

1. The taxes paid under protest for the months June through October, 1982 were $137,469.38. Assuming this to be 5% of gross revenues, the

system generated revenues of about two and three-quarters millions of dollars.

"The cart(s) or other sales unit(s) shall be appropriately themed in keeping with the Folklife area and the sales personnel shall be appropriately costumed, all as approved by KIEE."

The Knoxville International Energy Exposition was to receive twenty percent of the gross receipts of the sales of this product, and the parties agreed to execute a separate standard form "Concession Lease type Agreement" relating to the sale of that product.

The theme and color code of the chair lift and gondola system were to be selected by the KIEE, and Section 4 of the lease contains an agreement that the chair lift and gondola "will offer much of the same excitement and overall ambience which is found in the modern day successful theme park." It also provides:

"The theming of the base station shall be as mutually agreed by the Design Review Board of KIEE and Lessee. *The theme shall be designed and constructed by Lessee to attract persons to the Chairlift and Gondola and shall blend with the area of destination and origin.* In the case of the Gondola and its association with the Folklife Festival area and Stokely Van-Camp, Inc., both base stations shall be based on a theme, as mutually agreed upon between KIEE and Lessee, designed to attract people to the Folklife Festival area but shall be in keeping with the overall theme of the Fair." (Emphasis added).

In Exhibit C to the lease agreement the financial arrangements between the parties are stated. Subsection 2 provides as follows:

"The fee to KIEE for the Chairlift and Gondola shall be based on the gross revenue (*gross revenue to be defined as equal to 95% of total gross receipts of Lessee; provided, however, if the local amusement tax is adjusted, the definition of gross revenue may be adjusted*) of ride tickets sold from all outlets or sources, including main gate booths, central ticket booths, group sales, tour and travel sales and other special promotional packages." (Emphasis added).

There follows a schedule of *percentages of gross revenues* to be paid to the lessor. It is clear from the language quoted above that the *parties contemplated that appellee's operation would be subject to the specific five percent amusement tax involved in this case.* The rental paid to the lessor would be appropriately altered if there should be any change in the rate of that tax. Otherwise it was based upon 95% of appellee's gross revenues from the system.

In my opinion this operation, viewed from a practical as well as a legal standpoint, was an integral part of the Exposition and existed primarily as an additional attraction and amusement therein. The parties contemplated that the amusement tax involved here would be paid by the lessee and that the lessor's rent would take the payment of that tax into account. For the lessee now to contend that the tax was not applicable to its operations, in my opinion, is wholly untenable.

I would reverse the judgment of the Court of Appeals and reinstate the judgment of the Chancellor. I am authorized to state that Justice Drowota concurs in this opinion.