THOMAS NELSON, INC. Appellee,

v.

Martha B. OLSEN, Commissioner of
Revenue, Appellant.

Supreme Court of Tennessee,
at Nashville.

Jan. 19, 1987.

Daryl J. Brand, Asst. Atty. Gen., W.J. Michael Cody, Atty. Gen. & Reporter, Nashville, for appellant.

Charles A. Trost, William H. Neely, Waller, Lansden, Dortch & Davis, Nashville, for appellee.

## OPINION

FONES, Justice.

The issue before this Court is whether advertising design models received pursuant to contracts for the development of advertising ideas are tangible personal property within the purview of Tennessee's Use Tax. We hold that these models were a crucial element of the contracts to conceive an advertising concept, rendering the costs of these transactions subject to the Use Tax.

Taxpayer is a Tennessee corporation, with its principal offices in Nashville, engaged in the publication of Bibles and other books and materials. Taxpayer regularly commissioned an Illinois corporation, American Motivate, Inc., to fashion promotional concepts for the marketing of Taxpayer's publications. In developing these concepts, American Motivate would create a model at each progressive stage in the creation of the promotional items. American Motivate would then send these models, along with a fee charge, to Taxpayer which would review the models to determine whether American Motivate was satisfactorily conveying the image that Taxpayer desired. If Taxpayer was satisfied with American Motivate's creation, an appropriately developed model would be transferred to a third party who would produce the actual promotional material.

During the relevant audit period, 1 December 1979 through 30 November 1982, total purchases by Taxpayer from American Motivate amounted to $178,963.43. The Tennessee Commissioner of Revenue assessed a $14,494.22 deficiency against Taxpayer for use taxes, plus penalty and interest, resulting from the American Motivate transactions. Taxpayer paid the alleged deficiency under protest. Prior to trial, the Commissioner and Taxpayer agreed that some of the deficiency was properly assessed, while some of it was not. $9,953.55 remains in dispute.

After a trial in which one witness testified, the trial court issued a memorandum which stated that the "sketches and drawings sent by American Motivate were merely incidental to the [advertising] ideas and do not change the nature and character of these ideas as intangible services." Citing this Court's opinion in *Commerce Union Bank v. Tidwell*, 538 S.W.2d 405 (Tenn. 1976), the trial court held that "the cost of the services performed by American Moti-

vate should not be subject to Tennessee's Sales and Use Tax."

The Commissioner appealed. We reverse.

Tennessee levies a use tax upon a certain percentage of the "cost of each item or article of tangible personal property when the same is not sold but is used, consumed, distributed, or stored for use or consumption in this state. ..." T.C.A. § 67–6–203 [formerly T.C.A. § 67–3003(b)]. "Tangible personal property" is defined as "personal property, which may be seen, weighed, measured, felt, or touched, or is in any other manner perceptible to the senses." T.C.A. § 67–6–102(17) [formerly T.C.A. § 67–3002(1)]. The state legislature has defined "use" as "the exercise of any right or power over tangible personal property incident to the ownership thereof...." T.C.A. § 67–6–102(18)(A) [formerly T.C.A. § 67–3002(h)].[1]

There is no dispute over the fact that the models received by Taxpayer were capable of being "seen, weighed, measured, felt, or touched," and Taxpayer undeniably exercised a "right or power" over these models incident to their ownership. The conclusion is inescapable that the statutory language prescribed by the legislature as defining the scope of the state use tax encompasses the transactions in which Taxpayer received these models. Unless Taxpayer is able to show some valid reason as to why these models should be exempted from the reach of the use tax, the entire costs of the transactions between American Motivate and Taxpayer must be subject to the tax. *See McKinnon & Co. v. State,* 174 Tenn. 619, 130 S.W.2d 91 (1939).

The bare assertion that the creation of these models constituted a minute part of what was actually a contract to provide a service does Taxpayer no good. Such an interpretation of Tennessee's Sales and Use Tax has previously been considered and rejected by this Court as administratively unworkable. *Saverio v. Carson,* 186 Tenn. 166, 208 S.W.2d 1018 (1948).[2]

In this Court, Taxpayer continues to rely on *Commerce Union.* In *Commerce Union,* the Commissioner of Revenue had assessed a tax deficiency upon the taxpayer for transactions involving the sale and lease of computer "software." The sales tax was levied upon these transactions because the software had been transferred in the form of tangible personal property, *i.e.* magnetic tapes and computer punch cards. In holding that these transfers of software were not sales of tangible personal property within the purview of the state sales tax,[3] this Court maintained that what was actually being purchased was information. Noting that the information comprising the software could also be transmitted either orally or electronically, the *Commerce Union* Court concluded that the tapes and cards were merely incidental methods of transmitting intangible intellectual creations from the originator to the user. In essence, this Court held that the basis for the tax assessment, the tangible personal property—the tapes and cards—was not a "crucial element" of the true object of the transactions, the intangible information. *Id.* at 407.

The principle enunciated in *Commerce Union* may be highlighted by contrasting this Court's decision in *Crescent Amusement v. Carson,* 187 Tenn. 112, 213 S.W.2d 27, 29 (1948). In *Crescent,* the Commis-

---

**1.** In 1985, the definition of "use" was expanded to include "the consumption of any of the services and amusements taxable under this chapter." Acts 1985, ch. 416, § 4. T.C.A. § 67–6–102(18)(B). The effective date of this amendment, however, was May 28, 1985, and therefore has no applicability to the taxes currently at issue.

**2.** Because of the supplementary nature of the sales and use taxes and their structure as a uniform system of taxes, relevant precedent in-

terpreting these taxes are virtually interchangeable. *See Broadacre Dairies v. Evans,* 193 Tenn. 441, 246 S.W.2d 78 (1952); *Woods v. M.J. Kelley Co.,* 592 S.W.2d 567 (Tenn.), *cert. denied* 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980).

**3.** The legislature has subsequently redefined "tangible personal property" to include computer software. T.C.A. § 67–6–102(14)(B). *See Creasy Systems Consultants, Inc. v. Olsen,* 716 S.W.2d 35 (Tenn.1986).

sioner of Revenue charged operators of movie theaters with a sales tax upon the cost of films rented by the operators for exhibition in their establishments. The operators argued that the rental fee was paid to the owners of the films for the mere "grant to [the operators] of the privilege of using and exhibiting a copyrighted production, and this amounts only to the exercise of an intangible property right; hence, not within the meaning or intent of the Sales Tax Law...." *Crescent Amusement,* 213 S.W.2d at 28.

In rejecting this contention and holding the entire rental fees subject to taxation under *Saverio v. Carson, supra,* this Court noted that the transfer of the intangible right, the privilege to exhibit the movie, without the tangible personal property, the film itself, would be virtually without value. Indeed, this is the very point upon which *Crescent* was distinguished in deciding *Commerce Union.* "In *Crescent* the tax was levied on the rental of a motion picture film. The film is inherently related to the movie; without the film there could have been no movie. Therein lies the crucial difference. Magnetic tapes and cards are not a crucial element of software." *Commerce Union,* 538 S.W.2d at 407.

Taxpayer argues that the transactions currently at issue fall within the principle enunciated in *Commerce Union,* maintaining that the transfer of the allegedly taxable tangible personal property was merely incidental to the purchase of intangible intellectual property. In essence, Taxpayer asserts that it commissioned the creation of advertising ideas, and the models that Taxpayer received were merely an incidental method of communicating these ideas and not a crucial element of the dealings with American Motivate. There is no question that Taxpayer bargained for and received the advertising ideas of American Motivate's personnel in the transactions in question. We believe, however, that the evidence preponderates against a conclusion that the tangible personal property received along with those ideas was not a crucial element of these transactions.

Although the trial court characterized the materials received by Taxpayer as "sketches and drawings," the exhibits presented to this Court and the testimony of the lone witness at trial indicate that these materials were more than mere sketches and drawings. In the jargon of the advertising industry, the tangible personal property acquired by Taxpayer included layouts, keylines, chromalins, camera-ready art, and mock-ups.

Each of these terms represent a separate stage in the progressive development of a promotional item. For instance, an advertisement in a print medium, *e.g.* a magazine, ordinarily begins as a layout, which is a schematic drawing of the proposed appearance for the ad. Often the layout has words, or copy, describing the advertised product. From an acceptable layout, the keyline and original art are developed. These are essentially a black and white assemblage of the graphic elements of the ad. The keyline is then used to produce a chromalin, wherein the appropriate colors are incorporated into the ad. Along with the chromalin a film is produced. This film or camera-ready art can be photomechanically reproduced to create a negative. The negative is used to place the advertisement in the publication. Although the testimony indicates that various publications can employ models at different stages of development to actually place an ad in the medium, ordinarily the film or camera-ready art is transferred to the publication which produces the negative and places the ad.

A mock-up is a preliminary representation of a three-dimensional promotional item, such as a display stand used to house and advertise books at the retail level. As with an appropriately developed print medium model, an acceptable mock-up is transferred to a third-party which produces the actual promotional item.

Taxpayer's vice-president of marketing testified that the purpose for acquiring the design models was to permit Taxpayer to review the sufficiency of the ad agency's creative ideas at each preparatory stage in the development of a promotional item. If

Taxpayer was not pleased with the concept presented in the model, appropriate changes could be made or the entire project could be scrapped. In fact, it is apparent from the testimony that these models were the *only* method by which Taxpayer could review the ideas of the ad agency. Without these models, Taxpayer would have had no way to correct mistakes or change format in the promotional materials that it commissioned; without these models, Taxpayer would not have been able to make an informed decision on whether the proposed ad project was worthy of completion; without these models, Taxpayer would not have even known what advertising idea had been created until the end product was produced.

We believe that this fact warrants a conclusion that these models were more than merely incidental by-products to the purchase of intangible intellectual property. Rather these models were a crucial, *i.e.* necessary, element in the editing process that was structured so as to create promotional materials that acceptably publicized Taxpayer's product to consumers. As with the relation of the celluloid to the movie in *Crescent Amusement*, these models were inherently related to the commissioned advertising ideas—these models were the very embodiment of the ideas.

Taxpayer argues that the fact that the acquired models were routinely destroyed after being reviewed places this case within the principle enunciated in *Commerce Union*. In that case, the fact that the magnetic tapes and cards were either returned or destroyed after being used to program a computer was found to be relevant because this fact illustrated that the information plugged into the computer was the true corpus of the allegedly taxable transactions, not the tapes or cards.

In the present case, after Taxpayer reviewed the acceptability of the advertising concept embodied in a model, essentially two options were available: (1) commission the next stage of the project; or (2) scrap the project. After this decision was made, Taxpayer no longer had any use for the reviewed model, so that model became expendable.

Regardless of which option was chosen, the inherent relation between the intangible intellectual property, *i.e.* the advertising idea, and the tangible personal property should be apparent. If the project was continued and the expendable model destroyed, the commissioned idea survived only because it became embodied in another piece of tangible personal property. If the project was terminated and the expendable model destroyed, the commissioned idea literally physically vanished. In *Commerce Union*, even after the allegedly taxable tangible personal property had been discarded, and no new tangible personal property created therefrom, the intangible intellectual property remained accessible. In short, the tapes and cards were not required for the information to exist.

Taxpayer also argues that the fact that the commissioned ideas may have been transmittable electronically through computers in a process referred to as "computer-aided design" indicates that the models at issue were not a crucial element in the purchase of the intangible advertising ideas. It is true that the *Commerce Union* Court noted that the Commissioner of Revenue had apparently not attempted to tax transactions whereby the taxpayer's computers had been programmed by virtue of electronic transmissions over telephone lines. This fact was deemed relevant because it illustrated that magnetic tapes and cards were not the only method whereby the purchased information could be transmitted from the originator to the user. The tapes and cards were not perceived, therefore, to be a crucial element of the allegedly taxable transactions.

Whatever capabilities for the electronic transmission of advertising ideas may have existed during the relevant audit period, the testimony is clear that Taxpayer had no such capability. The only method by which Taxpayer could review the commissioned ideas was through the tangible personal property acquired in the transactions presently at issue. Once again, we believe that

this fact illustrates the crucial role that these models played in the contracts bargained for by Taxpayer.

In conclusion, we hold that the advertising design models acquired by Taxpayer pursuant to contracts commissioning the creation of advertising concepts were tangible personal property within the purview of Tennessee's Sales and Use Tax, thus subjecting the entire costs of these transactions to taxation. The order of the trial judge is reversed. Costs are assessed against Taxpayer. This cause is remanded for further proceedings consistent with this opinion.

BROCK, C.J., and COOPER, HARBISON, DROWOTA, JJ., concur.