IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

# EQUIFAX CHECK SERVICES, INC. v. RUTH E. JOHNSON, COMMISSIONER OF REVENUE, STATE OF TENNESSEE

**Direct Appeal from the Chancery Court for Davidson County**
**No. 95-4077-II     Carol L. McCoy, Chancellor**

_____

**No. M1999-00782-COA-R3-CV - Decided June 27, 2000**

_____

Ruth E. Johnson, Commissioner of Revenue, State of Tennessee, appeals the trial court's final judgment which ruled that electronic check guarantee services provided by Equifax Check Services, Inc., to Tennessee merchants were not taxable as telecommunication services under the Tennessee Retailers' Sales Tax Act. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded**

FARMER, J., delivered the opinion of the court, in which CRAWFORD, P.J.,W.S., and HIGHERS, J., joined.

Paul G. Summers, Attorney General and Reporter, and Margaret M. Huff, Assistant Attorney General, for the appellant, Ruth E. Johnson, Commissioner of Revenue, State of Tennessee.

Michael D. Sontag, Bryan W. Metcalf, Nashville, Tennessee, and John L. Coalson, Jr., Atlanta, Georgia, for the appellee, Equifax Check Services, Inc.

**OPINION**

The parties stipulated to the following facts. Equifax is a Delaware corporation which has its principal place of business in St. Petersburg, Florida. During the relevant audit period, Equifax provided check guarantee services to merchants that accepted personal checks from their customers. Most of Equifax's check approval services were provided by the use of telecommunications, and, in fact, telecommunications were essential to Equifax's method of operation.

In a typical transaction, the telecommunication began and ended at the merchant's point-of-sale terminal. The merchant was responsible for entering certain identifying information into its point-of-sale device. The point-of-sale device's modem then transmitted the information to Equifax over telephone lines owned by third-party carriers. In most cases, the merchant's modem contacted Equifax by dialing a 1-800 number. Equifax provided the 1-800 number to its merchants, and the third-party carrier billed Equifax for use of the number. In some cases, rather than using a 1-800

number, Equifax or the merchant leased a dedicated telephone line from a third-party provider. In the small remainder of cases, the merchant communicated with Equifax by using an existing telecommunication network provided by a third-party vendor, such as American Express, MasterCard, or Visa.

The third party's telephone lines transmitted the call from the merchant's modem to one of Equifax's modems at its facility in Tampa, Florida. Usually, the entire transmission took place between the merchant's and Equifax's respective modems. The merchant's modem transmitted the check identifying information to Equifax's modem. Equifax's modem then transmitted this information to its computer system, which had a database containing information about millions of check writers. Based on the information received, Equifax's computer system either approved or declined the check, and it sent an approval or declination code back to the merchant using the same modems and telephone lines that were used to submit the check approval request.

Equifax charged the merchant a fee for its check approval services that was based primarily on a percentage of the check's face amount. Equifax did not itemize its invoices to show telecommunication costs, nor did it separately bill merchants for telecommunication costs. Instead, telecommunication costs were considered to be part of Equifax's overhead costs.

The Commissioner conducted an audit of Equifax for the period from December 1989 through December 1994. Based upon her conclusion that Equifax provided telecommunication services to its check approval customers, the Commissioner assessed Tennessee sales and use taxes upon Equifax's entire gross receipts from customers located within the state of Tennessee. The tax assessed against Equifax for the audit period totaled $767,496. The Commissioner also assessed $278,912 in interest and $191,901 in penalties against Equifax.

Equifax challenged the Commissioner's tax assessment by filing this lawsuit in the Chancery Court of Davidson County. *See* Tenn. Code Ann. § 67-1-1801 (1994 & Supp. 1995). Equifax later moved for summary judgment on the issue of whether its check guarantee services constituted taxable telecommunication services. After considering the parties' arguments and stipulations of fact, the trial court entered a final judgment ruling in favor of Equifax. In support of this ruling, the trial court reasoned, *inter alia*,

> that Equifax Check never provided telecommunications services separate and apart from the check guarantee services for which its customers contracted. The telecommunications services were completely without value to the customer except in connection with and as a part of the check guarantee service that Equifax Check provided and for which its customers actually contracted. Equifax Check and its customers did not bargain for telecommunications services separate and apart from the check guarantee services.
>
> Although telecommunications services are essential to Equifax Check's guarantee services, telecommunication services are merely a means for delivering

those check guarantee services and, as such, are merely incidental to the provision of those services. The statute, . . . does not provide that all services which are delivered, in whole or in part, through the use of telecommunications services are taxable. Rather it provides that when the totality of the circumstances indicates that telecommunications services, such as paging services, are themselves being furnished for a consideration, those services are taxable. The delivery of check guarantee services through a telecommunications system does not render the check guarantee services taxable.

On appeal, the Commissioner concedes that Equifax's check guarantee service, by itself, did not constitute a taxable service under Tennessee's tax code. Nevertheless, the Commissioner contends that, because telecommunication services were an essential element of Equifax's check guarantee services, Equifax was furnishing taxable telecommunication services to its Tennessee customers.

We begin our analysis of this issue with the well-established rule that courts must construe tax statutes liberally in favor of the taxpayer and, conversely, strictly against the taxing authority. *See White v. Roden Elec. Supply Co.*, 536 S.W.2d 346, 348 (Tenn. 1976); *Memphis St. Ry. v. Crenshaw*, 55 S.W.2d 758, 759 (Tenn. 1933). Where any doubt exists as to the meaning of a taxing statute, courts must resolve this doubt in favor of the taxpayer. *See Memphis Peabody Corp. v. MacFarland*, 365 S.W.2d 40, 42 (Tenn. 1963); *accord Carl Clear Coal Corp. v. Huddleston*, 850 S.W.2d 140, 147 (Tenn. Ct. App. 1992). Courts may not extend by implication the right to collect a tax "beyond the clear import of the statute by which it is levied." *Boggs v. Crenshaw*, 7 S.W.2d 994, 995 (Tenn. 1928). By the same token, courts must give effect to the "plain import of the language of the act" and must not use the strict construction rule to thwart "the legislative intent to tax." *International Harvester Co. v. Carr*, 466 S.W.2d 207, 214 (Tenn. 1974); *see also Bergeda v. State*, 167 S.W.2d 338, 340 (Tenn. 1943) (indicating that courts "must give full scope to the legislative intent and apply a rule of construction that will not defeat the plain purposes of the act").

During the audit period, the Tennessee Retailers' Sales Tax Act imposed a sales tax on all retail sales, including "[t]he furnishing, for a consideration, of either intrastate or interstate telecommunication services." Tenn. Code Ann. § 67-6-102(22)(F)(iii) (1989).[1] The Act defined "telecommunication" as "communication by electric or electronic transmission of impulses," including the "transmission by or through any media such as wires, cables, microwaves, radio waves, light waves or any combination of those or similar media." Tenn. Code Ann. § 67-6-102(27) (1989).[2] The Act provided that, unless otherwise indicated, the term telecommunication included, but was not limited to,

---

[1]This section later became Tenn. Code Ann. § 67-6-102(23)(F)(iii) (1994), and is now codified at Tenn. Code Ann. § 67-6-102(24)(F)(iii) (1998 & Supp. 1999).

[2]This section later became Tenn. Code Ann. § 67-6-102(29) (1994), and is now codified at Tenn. Code Ann. § 67-6-102(30) (1998 & Supp. 1999).

all types of telecommunication transmissions, such as telephone service, telegraph service, telephone service sold by hotels or motels to their customers or to others, telephone service sold by colleges and universities to their students or to others, telephone service sold by hospitals to their patients or to others, WATS service, paging service, value added networks, and cable television service sold to customers or to others by hotels or motels.

Tenn. Code Ann. § 67-6-102(27)(B) (1989).[3]

We agree with the trial court's interpretation of the foregoing provisions and, thus, conclude that Equifax was not providing taxable telecommunication services within the meaning of the Retailers' Sales Tax Act. The purpose of the check guarantee services provided by Equifax to its Tennessee merchants was to approve or decline checks written by the merchants' customers. Although this information was communicated via telecommunications, Equifax was not in the business of providing telecommunication services to the merchants. As pointed out by the trial court, the telecommunications used to convey this information had no value to the merchant separate and apart from the check guarantee services provided by Equifax. The record contains no indication that the merchants used the 1-800 numbers or telephone lines provided by Equifax to communicate with any party other than Equifax or to communicate any information that was not related to Equifax's check guarantee services.

In our view, this interpretation of the statute is consistent with the Act's provision describing the types of telecommunication services that were taxable under the Act. Although the Act broadly defined "telecommunication" as "communication by electric or electronic transmission of impulses," including the "transmission by or through any media such as wires, cables, microwaves, radio waves, light waves or any combination of those or similar media," *see* Tenn. Code Ann. § 67-6-102(27) (1989), the Act provided a list of the types of telecommunication transmissions that the legislature intended to tax. These examples included telephone service, telegraph service, WATS service, paging service, value added networks, and cable television service sold by hotels or motels. *See* Tenn. Code Ann. § 67-6-102(27)(B) (1989). For the most part, these examples described services that could be used by the consumer for purposes of general communication. That is, the consumer could use the service to communicate with a multitude of parties, not just the party providing the services.[4]

---

[3]*See supra* note 2.

[4]As for the remaining examples, we note that the Commissioner does not contend that Equifax's check guarantee service constituted a value added network. The "value added networks" example was deleted by the legislature in 1993. *See* 1993 Tenn. Pub. Acts 51. We further note that the provision's reference to cable television service did not include all cable television services, but only those services sold by hotels and motels. *See* Tenn. Code Ann. § 67-6-102(27)(B) (1989).

-4-

We also believe that this interpretation is supported by the court's decision in ***Commerce Union Bank v. Tidwell***, 538 S.W.2d 405 (Tenn. 1976). Although the issue in that case was different, *i.e.* whether computer software recorded on magnetic tapes was taxable as tangible personal property, the court's analysis is instructive. In rejecting the Commissioner's argument that the software was taxable, our supreme court explained that

> [w]hat is created and sold here is information, and the magnetic tapes which contain this information are only a method of transmitting these intellectual creations from the originator to the user. It is merely incidental that these intangibles are transmitted by way of a tangible reel of tape that is not even retained by the user.
>
> . . . .
>
> . . . . A magnetic tape is only one method whereby information may be transmitted from the originator to the computer of the user. That same information may be transmitted from the originator to the user by way of telephone lines, or it may be fed into the user's computer directly by the originator of the program.
>
> . . . . Transfer of tangible personal property under these circumstances is merely incidental to the purchase of the intangible knowledge and information stored on the tapes.

***Commerce Union***, 538 S.W.2d at 407-08.

In a subsequent decision, the supreme court further explained its holding in ***Commerce Union***:

> [T]he ***Commerce Union*** Court concluded that the tapes and cards were merely incidental methods of transmitting intangible intellectual creations from the originator to the user. In essence, this Court held that the basis for the tax assessment, the tangible personal property – the tapes and cards – was not a "crucial element" of the true object of the transactions, the intangible information. [***Commerce Union***, 538 S.W.2d] at 407.
>
> . . . .
>
> . . . . In short, the tapes and cards were not required for the information to exist.

***Thomas Nelson, Inc. v. Olsen***, 723 S.W.2d 621, 622-24 (Tenn. 1987).[5]

---

[5]The court also pointed out, however, that the legislature subsequently redefined "tangible personal property" to include computer software. *See **Thomas Nelson***, 723 S.W.2d at 622 n.3; *see*

We similarly conclude that, in the present case, the product created and sold by Equifax was information, not telecommunication services. Telecommunication was merely the method of transmitting this information to Equifax's merchants. Stated another way, the true object of the transactions was not telecommunication services, but the information itself. Although Equifax admittedly relied upon telecommunications to transmit the information, telecommunications were not required for the information to exist.

This approach is consistent with other supreme court decisions which, in determining the nature of the service being provided, look at the primary purpose of the transaction. In *Sky Transpo, Inc. v. City of Knoxville*, 703 S.W.2d 126 (Tenn. 1985), for example, the supreme court was required to determine whether the gondola and chair lift operated by the taxpayer at the 1982 World's Fair in Knoxville constituted a taxable amusement. Ruling in favor of the taxpayer, the supreme court concluded

> that [the taxpayer's] gondola and chair lift were primarily means of transportation rather than amusements within the meaning of Chapter 776, Private Acts of 1947. [The taxpayer], therefore, is not subject to the 5% admissions tax imposed by the Act.
>
> We adhere to the rule that "tax statutes are to be liberally construed in favor of the taxpayer and strictly construed against the taxing authority." *White v. Roden Electrical Supply Co., Inc.*, 536 S.W.2d 346, 348 (Tenn. 1976). We are not persuaded by the City's argument that the Sky Transpo system was primarily an amusement because it provided passengers with an entertaining vantage point from which to view the fair below. We agree with the Court of Appeals that
>
>> "[i]n the case at bar sight-seeing [was] not the ostensible purpose for which tickets were purchased. In the first place, the majority of one's view consisted of people, many of whom were standing in line waiting to enter a pavilion. The principal and interesting sights to be seen were those displayed inside the various national pavilions."

*Sky Transpo*, 703 S.W.2d at 129. The court reasoned that the primary purpose of the lift was not to entertain passengers, but to transport them along the mile-long, linear fair site. *See id*. at 128; *cf. Thomas Nelson, Inc. v. Olsen*, 723 S.W.2d 621, 624 (Tenn. 1987) (holding that models designed to convey advertising ideas were taxable as tangible personal property under the Act because "these models were the very embodiment of the ideas").

In the present case, the primary purpose of the services provided by Equifax was not to furnish telecommunication services but, instead, to furnish check guarantee services. Construing the taxing statute in Equifax's favor, we conclude that, despite Equifax's reliance upon

---

*also* Tenn. Code Ann. § 67-6-102(25)(B) (1998 & Supp. 1999).

telecommunications to provide its check guarantee services, these services did not constitute taxable telecommunication services within the meaning of the Retailers' Sales Tax Act.

Accordingly, we affirm the trial court's judgment and remand this cause for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellant, Ruth E. Johnson, Commissioner of Revenue, State of Tennessee, for which execution may issue if necessary.