**PRODIGY SERVICES CORPORATION, INC.**

v.

**Ruth E. JOHNSON, Commissioner of Revenue, State of Tennessee, et al.**

Court of Appeals of Tennessee, at Nashville.

April 8, 2003 Session.

Aug. 12, 2003.

Permission to Appeal Denied by Supreme Court Dec. 22, 2003.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Margaret M. Huff, Assistant Attorney General, for the appellant, Ruth E. Johnson, Commissioner of Revenue, State of Tennessee, and the Attorney General.

Charles A. Trost and Michael G. Stewart, Nashville, Tennessee; Peter J. Brann, Lewiston, Maine, for the appellee, Prodigy Services Corporation, Inc.

Joseph W. Gibbs and Patricia Head Moskal, Nashville, Tennessee; Richard P. Bress and John W. Westmoreland, Washington, DC, for the amici curiae, Information Technology Association of America and U.S. Internet Service Providers Association.

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN, J. and ROYCE TAYLOR, Sp. J., joined.

## OPINION

The Tennessee Commissioner of Revenue assessed Prodigy Services Corporation, Inc. for sales and use taxes on "telecommunication services" as defined in Tenn.Code Ann. § 67–6–102(29)(now codified at Tenn.Code Ann. § 67–6–102(31)(Supp.2002)). Prodigy challenged the assessment in the Chancery Court of Davidson County. The court granted Prodigy summary judgment, concluding that Prodigy's online computer information services did not meet the description of the taxable event in the statute. We affirm.

### I.

#### A. THE TAXING STATUTES

In 1947 the Tennessee Legislature imposed a tax on the privilege of selling at retail a wide array of goods and services. See Tenn.Code Ann. § 67–6–201, et seq. Somewhere along the way a "retail sale" was defined to include "The furnishing, for a consideration, of either intrastate or interstate telecommunication services." Tenn.Code Ann. § 67–6–102(25)(F)(iii)(Supp.2002). As if to emphasize the point, the Legislature in 1989 also stated, "Notwithstanding other provisions of this chapter, a state tax with respect to interstate telecommunication services shall be imposed at the rate of five and one-half percent (5.5%)." Tenn.Code Ann. § 67–6–

221(a).[1]

The inclusion of telecommunication services in the tax base required that the term be defined, and that definition now appears in Tenn.Code Ann. § 67–6–102(31)(A–C)(Supp.2002):

(31)(A) "Telecommunication" means communication by electric or electronic transmission of impulses;

(B) "Telecommunications" includes transmission by or through any media, such as wires, cables, microwaves, radio waves, light waves, or any combination of those or similar media;

(C) Except as provided in subdivision (a)(31)(D), "telecommunications" includes, but is not limited to, all types of telecommunication transmissions, such as telephone service, telegraph service, telephone service sold by hotels or motels to their customers or to others, telephone service sold by colleges and universities to their students or to others, telephone service sold by hospitals to their patients or to others, WATS service, paging service, and cable television service sold to customers or to others by hotels or motels;

### B. PRODIGY'S SERVICES

During the audit period Prodigy offered two online products, Prodigy Classic and Prodigy Internet. The tax assessment was based exclusively on the sale of these two services. The parties disagree about how the Prodigy services should be described, but it is our opinion that the disagreement does not amount to a disputed question of material fact. It is the actual service provided that is important, not how it is characterized in a patent abstract or a customer contract. Since we must take the facts in the record in the light most favorable to the Commissioner in order to

sustain the motion for summary judgment, *Staples v. CBL & Associates, Inc.,* 15 S.W.3d 83 (Tenn.2000), we make the following recitation with that in mind.

Prodigy furnishes a software program that can be downloaded on the subscriber's personal computer. The program furnishes tax information, computer services, and conversion services. In short, the program allows the subscriber to access information and to perform certain functions through the internet. A command from the subscriber's computer is converted to computer language and transmitted by use of a modem through the subscriber's telephone line to a Prodigy computer somewhere within the state. Some of the desired information or service may come from the local computer or it may involve communicating with Prodigy's main computers in Yorktown Heights, New York. The link between the local computer and the New York computer is through lines leased from common carriers or through services leased from other networks that have their own carrier capabilities or that sub-let to Prodigy the carrier capabilities leased from others. The Prodigy programs provide a link to the internet, which allows the subscriber to send and receive e-mail. Thus, the ability to communicate is an important feature of the Prodigy service.

### II.

### GOVERNING PRINCIPLES

■ In reviewing a summary judgment it is important to keep in mind that only a question of law is involved; therefore there is no presumption of correctness of the lower court's judgment, *Byrd v. Hall,* 847 S.W.2d 208 (Tenn.1993), and the appellate courts must make a fresh determination that the requirements of Tenn. R. Civ.

---

1. The tax rate is now six percent (6%).

P. 56 have been satisfied. *Hunter v. Brown,* 955 S.W.2d 49 (Tenn.1997).

■ Statutes imposing a tax should be construed strictly against the government. *SunTrust Bank v. Johnson,* 46 S.W.3d 216 (Tenn.Ct.App.2000). Tax statutes "will not be extended by implication beyond the clear import of the language used, nor will their operation be enlarged so as to embrace matters [or persons] not specifically named or pointed out." *National Gas Distributors, Inc. v. State,* 804 S.W.2d 66, 67 (Tenn.1991).

■ The Commissioner, on the other hand, argues that a tax assessment is presumed to be correct and the taxpayer must overcome that presumption by clear and convincing evidence. *See* Tenn.Code Ann. § 67–6–517(a) and Tenn.Code Ann. § 67–1–1438(a). These statutes, however, apply to the *facts* that must be shown to overcome the *amount* of the assessment. They do not apply to a question of whether the *activity* is within the statute. The cases cited by the Commissioner deal with situations where the taxpayer is claiming that the Commissioner's methodology is flawed, *James v. Huddleston,* 795 S.W.2d 661 (Tenn.1990); *Louis Dreyfus Corp. v. Huddleston,* 933 S.W.2d 460 (Tenn.Ct.App. 1996), or is based on an erroneous finding of fact, *McKinnon & Co. v. State,* 174 Tenn. 619, 130 S.W.2d 91 (1939). Otherwise the authorities we have cited regarding the construction of tax statutes would all be in conflict with Tenn.Code Ann. § 67–6–517(a) and Tenn.Code Ann. § 67–1–1438(a). Since *SunTrust* and *National Gas Distributors* date from a time long after the passage of the two statutes in question, we conclude that the Legislature did not change the rule that tax statutes should be strictly construed against the government.

■ The primary goal of the courts is to ascertain the intent of the Legislature,

*Limbaugh v. Coffee Med. Ctr.,* 59 S.W.3d 73 (Tenn.2001), and we resort to what we call "well-settled principles" in performing this function. But certain "principles," often cited and apparently well-settled, conflict with each other. On one hand we say that if the plain words of the statute mean one thing we cannot give them another meaning by use of judicial interpretation. *Gleaves v. Checker Cab Transit Corp., Inc.,* 15 S.W.3d 799 (Tenn.2000). On the other hand, our Supreme Court has also said, "The real intention will always prevail over the literal use of terms. Legislative acts fall within [this] rule, and it has been well said that a thing which is within the letter of a statute is not within the statute unless it be within the intention of the lawmakers." *Standard Oil Co. v. State,* 117 Tenn. 618, 100 S.W. 705, 709–10 (1907)(quoting *Brown v. Hamlett,* 8 Lea 735 (Tenn.1882)). Continuing, the court referred to the important part the history of the times plays in arriving at the legislative intent:

> The occasion of the enactment of a law may always be referred to in interpreting and giving effect to it. The court should place itself in the situation of the legislature, ascertain the necessity and probable object of the statute, and then give such construction to the language used as to carry the intention of the Legislature into effect, so far as it can be ascertained from the terms of the statute itself.

*Id.* at 710 (quoting *People v. Supervisors of Columbia County,* 43 N.Y. 130 (1870)). We think the background against which the statute was passed plays an important part in arriving at the legislative intent.

## III.

### ANALYSIS

The last enactment by the General Assembly that has a bearing on this dispute

occurred in 1989 when the definition of "telecommunication services," found in Tenn.Code Ann. § 67–6–102(31)(A–C)(Supp.2002), was added to the Code. At that time the commercial internet had not been developed, although Prodigy was offering some online services to its customers. In 1991, the Tennessee Department of Revenue informed Prodigy that its online services were not taxable. In 1996, apparently on the theory that Prodigy's services had grown into the definitions in the statute, the Department reversed itself and took the position that Prodigy's services were taxable telecommunication services. Prodigy argues that since the thing sought to be taxed was not in existence at the time the statute was passed the legislative intent could not possibly encompass this activity.

We think it is too easy to say that an invention not in use when the statute was passed cannot have been within the intent of the legislature. *Prater v. Reichman*, 135 Tenn. 485, 187 S.W. 305 (1916) has been cited for that proposition, but we note that the court went on to say that the article in question was "so entirely dissimilar in kind from any of the articles mentioned in our exemption statutes that it cannot be held to be embraced therein." *Id.* at 307. In an era of rapid technological change new services appear every day. To say that these services are or are not covered by a general tax statute requires more than just a comparison of the time the statute was passed and the time the service became available.

The legislature may have intended to encompass later technological advances that produce things of the same kind mentioned in the statutes. The Commissioner urges us to consider whether the statute is restrictive or expansive by looking at the face of the statute and the legislative history. *See* Keith A. Christiansen, *Technolog-ical Change and Statutory Interpretation*, 1968 Wis. L.Rev. 556. Following that line of argument the Commissioner finds expansive language in the statute, such as "transmission by or through any media" and "includes but is not limited to, all types of telecommunication transmissions." *See* Tenn.Code Ann. § 67–6–102(31)(B & C)(Supp.2002).

But we think that focus is too narrow and ignores the state of the law relative to taxing and regulating telecommunication services in 1989. In that year it became clear that states could tax interstate telephone calls. *See Goldberg v. Sweet*, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). The debates in the legislature suggest that the members intended to take advantage of that opening on a broad front. Hence the examples in Tenn.Code Ann. § 67–6–102(31)(C)(Supp.2002): "telephone service, telegraph service, telephone service sold by hotels or motels to their customers or to others, telephone service sold by hospitals to their patients or to others, WATS service, paging service, and cable television service sold to customers or to others by hotels or motels." Notably absent is any mention of the types of online services offered by vendors such as Prodigy.

■ The floor debates are also notable for not referring specifically to any of these services. The 1989 bill did contain "value added networks," but the Department of Revenue was never able to determine precisely what that meant, so in 1993 the Legislature deleted that part of the statute. On the Senate floor Senator Rochelle explained the reason why:

[T]his bill is one that addresses the telecommunications tax that we passed three or four years ago, and clears up a couple of difficulties that we've had.... I think everyone agrees this needs to be done. It will, in essence, the prime

thing it does is eliminates value added networks from taxation. The reason for that is, is that nobody has been able to determine why [sic] a value added network is. And with the fast paced changes in the telecommunications business, this is causing us difficulty in that folks don't know whether they can do something or can't do something whether it might end up being called a value added network. I think everyone has agreed that this bill is something that we ought to pass.

Floor Debate on Senate Bill 157 before the Senate, 98th Gen. Assembly, 1st Reg. Sess. S–19 (Tenn.1993).

Two commentators concluded that in deleting value added networks the Legislature intended to remove any possibility that information services could be taxed as telecommunications. Their comment was as follows:

[I]n 1993, Tennessee enacted legislation that exempted telephone-based information services from Tennessee's telecommunications sales tax. The law removed the term "value added network" from the section of the Tennessee Telecommunications Tax Act that defines the kinds of services to which the tax applies. *In the absence of such legislative action the Tennessee tax rules could have been interpreted to tax electronic information services.*

Karl A. Frieden & Michael L. Parker, *The Taxation of Cyberspace: State Tax Issues Related to the Internet and Electronic Commerce,* 11 State Tax Notes 1363, 1390 (Nov. 11, 1996)(emphasis added).

All of this activity should be viewed against the regulatory background on both the state and federal levels. Whereas the Tennessee Regulatory Authority is charged with the regulation of public utilities that provide "telecommunication ser-

vices," Tenn.Code Ann. § 65–4–101(c), that term is defined as follows:

"Telecommunications service provider" means any incumbent local exchange telephone company or certificated individual or entity, or individual or entity operating pursuant to the approval by the commission of a franchise within § 65–4–207(b), authorized by law to provide, and offering or providing for hire, any telecommunications service, telephone service, telegraph service, paging service, or communications service similar to such services unless otherwise exempted from this definition by state or federal law.

That definition means that service providers such as Prodigy are not regulated as a public utility.

On the federal level, for purposes of regulation, the law has always made a distinction between regulated telecommunication services and unregulated information services:

Throughout this opinion we use the FCC's terms "basic" and "enhanced" to distinguish between regulated common carrier communications services, which consist largely of plain old telephone service (POTS), and unregulated data processing services which use the telephone network to convey information from remote computers to customers' terminals. In the FCC's formal terms, basic service is the offering of a "pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information." Final Decision, *In re Amendment of Section 64.702 of the Commission Rules and Regulations (Second Computer Inquiry),* 77 F.C.C.2d 384, 420 (1980) (Computer II Final Decision). An enhanced service combines basic service with "computer processing applications [that] ... act on

the format, content, code, protocol or similar aspects of the subscriber's transmitted information, or provide the subscriber additional, different or restructured information, or involve subscriber interaction with stored information. *Id.* at 387; *see also* 47 C.F.R. § 64.702(a)(1989). Database services, in which a customer dials a number to obtain access to stored information, such as Dow Jones News, Lexis, and "Dial It" sports scores, are examples of enhanced services.

*California v. F.C.C.*, 905 F.2d 1217, 1223 n. 3 (9th Cir.1990).

Thus, companies that provide communication services through the use of the Internet, are not regulated as "telecommunication service providers." *See Howard v. America Online, Inc.*, 208 F.3d 741 (9th Cir.2000); *CompuServe, Inc. v. Cyber Promotions, Inc.*, 962 F.Supp. 1015 (S.D.Ohio 1997). Thus, the distinction persists between "basic" telecommunication services of the type mentioned in the statute (telephone, telegraph, WATS, paging) and "enhanced" services (information services, conversion services, computer services and Internet access). We think the chancellor was correct in concluding that the Legislature did not intend for the services Prodigy provides to come within the statutory definition.

Finally, we think that telecommunications services were not the "true object" of the Prodigy sale, even if some of the services fit that definition. *See Commerce Union Bank v. Tidwell*, 538 S.W.2d 405 (Tenn.1976). The customer had to supply its own telephone service to the Prodigy computer. Then Prodigy used telecommunication services as a means of tying its local computer to the main computer in New York. Thus, as Prodigy points out, it was a consumer of telecommunication services, not a provider. Although Prodigy's

programs allowed their users to communicate through the internet, that capability is one of those enhanced services that does not come within the definition of "telecommunication services."

The judgment of the court below is affirmed and the cause is remanded to the Chancery Court of Davidson County for further proceedings. Tax the costs on appeal to the State.