# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 19, 2013 Session

## LEVEL 3 COMMUNICATIONS, LLC v. RICHARD ROBERTS, COMMISSIONER OF REVENUE, STATE OF TENNESSEE

**Appeal from the Chancery Court for Davidson County**
**No. 052266IV      Russell T. Perkins, Chancellor**

---

**No. M2012-01085-COA-R3-CV - Filed September 20, 2013**

---

Company providing dial-up and broadband Internet services to Internet Service Providers that in turn provided these services to end-users sought refund of sales taxes it had paid to the State from January 2001 through March 2004 on the ground that its services did not constitute "telecommunications" or "telecommunication services" as those terms are defined in Tenn. Code Ann. § 67-6-102(a)(32). Both the Company and the State filed motions for summary judgment and the trial court granted the Company's motion. The trial court found the Company provided Internet access services, the services were "enhanced" rather than "basic" services, and the true object of the services was not telecommunications. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter, William E. Young, Solicitor General, and Jonathan N. Wike, Assistant Attorney General, for the appellant, Richard H. Roberts, Commissioner of Revenue, State of Tennessee.

Brett R. Carter, Nashville, Tennessee, for the appellee, Level 3 Communications, LLC.

## OPINION

### I. FACTUAL BACKGROUND

Level 3 Communications, LLC ("Level 3") is a Delaware limited liability company with a principal place of business in Colorado. During the period at issue, January 2001

through March 2004, Level 3 provided two internet services it called "(3)Connect Modem" and "(3)Crossroads." Level 3 collected Tennessee sales taxes on those services over this time period and remitted the taxes to the Commissioner of Revenue for Tennessee (the "State").

In January 2004, the State published Sales & Use Tax Notice #04-03, which indicated that "Internet access is no longer considered a taxable 'telecommunication service' under Tennessee law." The State invited internet service providers and telecommunications companies to submit a claim for a refund of sales taxes collected and remitted for Internet access charges, and Level 3 submitted a claim for a refund in the amount of $1,151,007.77. The State denied Level 3's claim for a refund, and Level 3 filed a complaint to recover the sales taxes it claims it wrongfully had assessed its customers and paid the State.

Both parties moved for summary judgment. The trial court granted Level 3's motion and denied the State's motion. The facts the trial court relied on, that the parties do not dispute, include the following:

(3)Connect Modem was a wholesale dial-up Internet service and (3)CrossRoads was a wholesale broadband Internet service. Level 3's customers purchased these services to enable their end-users to access the Internet. Level 3's customers were retail or consumer Internet Service Providers ("ISPs"), such as EarthLink Communications and America Online, as well as large corporations that used the service for remote access to the corporate Local Area Network ("LAN"), which houses a corporation's server, database, file system, and e-mail. Level 3 considered itself to be a wholesale ISP because Level 3 provided the end-users access to the Internet; Level 3's customers did not.

(3)Connect Modem provided its customers with local telephone numbers. Federal or State regulatory bodies assigned these local telephone numbers in blocks. The ISPs put the numbers into a dialer software application and provided the numbers to their end-users, who had to have local telephone service in order to access the ISPs' services. When the end-user, using software provided by Level 3, dialed the local number, the number identified an Internet access entry belonging to Level 3 that allowed the end-user, through a series of conversions, to reach the Internet, surf the Internet, exchange e-mails, or use other applications enabled by access to the Internet. The end-user's call, made by modem, traveled through the end-user's local exchange carrier ("LEC").

When a local call initiated by an end-user's modem reached Level 3's infrastructure, Level 3 converted the call to Internet Protocol ("IP"), the means by which Level 3 took data

and converted it into packets for transmission over the Internet.[1]  IP divided the information into packets and marked each packet with a sequence number so that the packets could be reassembled in the proper order by a receiving system.  Upon converting the call to IP, Level 3 terminated the call or transferred the call and created a session on the Internet for the end-user.

By providing the local numbers, Level 3 provided its customers with access to the local dial network.  However, Level 3 did not provide a local dial network infrastructure.  The LEC that provided the end-user with local telephone service provided the local connectivity that enabled the modulated analog modem signal to travel to the LEC's switch at the LEC's central office.[2]  Level 3 entered into agreements with LECs to provide (3)Connect Modem service and interconnected with the LECs.  As Level 3's Director of Product Management for (3)Connect Modem explained, "A significant portion of the steps required to obtain Internet access would be performed by Level 3."

For the (3)Connect Modem end-users, Level 3 was able to convert their data into IP using its own equipment.  The hardware Level 3 used included routers that helped route IP packets around the country; Network Authentication Services ("NAS") which converted signals into Internet Packets; and a Radius device that stored and authenticated end-user credentials to insure that only end-users who purchased the service from Level 3's customers gained access to the Internet.  Level 3 analyzed the location indicated by the IP header and determined the best means to reach that location through the Internet, whether through Level 3's network or another network.

An ISP that purchased (3)Connect Modem or (3)CrossRoads service billed its end-users and provided them with e-mail addresses.  The ISPs provided the end-users with content, such as a home page that contained news streams, and provided access to the Internet.  Level 3 did not provide any content to the end-users.  Similarly, it did not create or modify the content it transmitted .  Level 3 billed its (3)Connect Modem customers based on either the amount of time their end-users spent online or the capacity of Level 3's network that the customers' service consumed.  Level 3 billed its (3)CrossRoads customers based on the size of the port the customers bought and how much traffic ran over it.[3]

_____

[1]IP is sometimes referred to as the language of the Internet.

[2]The local telephone number helped the LEC find Level 3 facilities and transfer the end-user's authentication request to Level 3's equipment.  The end-user's data signal was modulated by a modem traveling over a local network.

[3]A port refers to where the data flows and was located in one of Level 3's gateways.  A larger amount
(continued...)

(3)CrossRoads provided broadband Internet access connections. Like (3)Connect Modem, (3)CrossRoads was a wholesale Internet service, and it allowed ISPs doing business with Level 3 to provide their customers with faster access to the Internet than the dial-up service provided by (3)Connect Modem. Both services crossed Level 3's "backbone," which was the physical infrastructure that Level 3 built and used to offer Internet services to its customers' end-users.[4] Level 3's backbone consists of fiber optics in the ground, transport equipment, IP equipment, switches, routers, and other equipment. Level 3's routers and switches are located in numerous gateways throughout the country.[5]

The tax statute in effect in 2003 provided that "interstate telecommunication services sold to businesses shall be subject to a tax imposed at the rate of seven and one-half percent (7.5%)." Tenn. Code Ann. § 67-6-221(a). The issue in this case is whether the (3)Connect Modem and (3)CrossRoads services Level 3 provided its customers during the relevant period, January 2001 - March 2004, were taxable telecommunication services, as that term was then defined.

The relevant statute provided as follows:

(A) "Telecommunication" means communication by electric or electronic transmission of impulses;

(B) "Telecommunications" includes transmission by or through any media, such as wires, cables, microwaves, radio waves, light waves, or any combination of those or simil

(C) Except as provided in subdivision (a)(32)(D), "telecommunications" includes, but is not limited to, all types of telecommunication transmissions, such as telephone service, telegraph service, telephone service sold by hotels or motels to their customers or to others, telephone service sold by colleges and universities to their students or to others, telephone service sold by hospitals to their patients or to others, WATS service, paging service, and cable television service sold to customers or to others by hotels or motels;

---

[3](...continued)
of data requires a larger port.

[4]Level 3's Vice President of Product Delivery explained that (3)Connect Modem is narrow band and (3)CrossRoads is broadband. An end-user chooses which type of service to purchase from his or her ISP, and then the ISP buys the access chosen from Level 3 to provide to its end-user.

[5]A gateway is a point of interconnection where modems and routers are authenticated so that internet access can be provided to the end-users of Level 3's customers using Level 3's IP backbone.

(D) "Telecommunications" does not include public pay telephone services, television or radio programs which are broadcast over the airwaves for public consumption, coaxial cable television (CATV) which is offered for public consumption, private line service, or automatic teller machine (ATM) service, wire transfer or other services provided by any corporation defined as a financial institution under § 67-4-804(a)(9) [repealed], unless the company separately bills or charges its customers for specific telecommunication services rendered.

Tenn. Code Ann. § 67-6-102(a)(32) (2003).[6]

## II. TRIAL COURT'S DECISION

The trial court noted that Level 3's business of providing access to the Internet does not fall neatly into the definition of either "telecommunications" or "telecommunication transmissions" as set forth in the statute. The court reviewed the organization of the statutory definition, noting that subsection (A) includes a broad definition of "telecommunications," subsections (B) and (C) provide progressively more limited definitions, and subsection (D) lists exceptions from the definition.

The court then applied the "true object" or "primary purpose" test that Tennessee courts have used when a business activity is difficult to classify for tax purposes, writing:

The fact that a company may be viewed as being a part of the telecommunications industry or as being a part of the Internet access services industry . . . is not determinative. . . . [T]he true object test favors Level 3 here because the true object of Level 3's sale of (3)Connect Modem and (3)CrossRoads to its customers was to provide Internet access on a wholesale basis through the use of telecommunication services - and not to provide telecommunication services. The fact that Level 3's customers were retailers (or corporations) who resold (or provided) these services to end-users does not change the character or purpose of the services that Level 3 offered during the relevant period.

The trial court reviewed the Court of Appeals' decision in *Prodigy Serv. Corp., Inc.*

---

[6]The definition of "telecommunications service" was later amended to exclude internet access service, but that amendment does not affect the outcome of this case. *See* Tenn. Code Ann. § 67-6-102(92)(B)(vi).

*v. Johnson*, 125 S.W.3d 415 (Tenn. Ct. App. 2003), and determined that under *Prodigy*'s analysis, Level 3's wholesale access business was not taxable. The trial court explained that the *Prodigy* court distinguished "basic services," which satisfy the definition of "telecommunication services" and are taxable, from "enhanced services," which do not satisfy the definition of "telecommunication services," and are not taxable. Quoting *Prodigy*, the trial court explained that basic services "involved the offering of pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information," whereas enhanced services combine basic services with "computer processing applications that act on the format, content, code, protocol or similar aspect of the subscriber's transmitted information, or provide the subscriber additional, different or restructured information, or involve subscriber interaction with stored information."

Then, based on the difference between "basic service" and "enhanced service," the trial court determined that Level 3's services were not taxable telecommunication services:

> The services provided are enhanced services and the true object of transactions involving (3)Connect Modem and (3)CrossRoads is the provision of access to the Internet. Stated differently, Level 3 is selling, and its customers are buying, Internet access in Level 3's transactions involving (3)Connect Modem and (3)CrossRoads. Additionally, the language of the statute, which must be construed against the taxing authority, demonstrates that Level 3's sale of the services at issue here did not constitute the sale of "telecommunication transmissions" under Tenn. Code Ann. § 67-6-102(a)(32)(C).

The State makes two arguments on appeal. First, the State asserts the trial court erred in ruling that the "true object" of Level 3's services was the provision of access to the Internet. The State contends instead that Level 3 provided Internet service providers with the transmission path necessary for end-user communication with the Internet, and that Level 3's services were therefore taxable as "telecommunication services." Second, the State asserts the trial court erred in ruling that Level 3's services were "enhanced services" and therefore not taxable as "telecommunication services" because Level 3's services involved nothing more than the protocol conversion that was necessary for efficient transmission.

### III. STANDARD OF REVIEW

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. West Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law. *Id.* Accordingly, this court must review the record

*de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co.*, *Inc*., 142 S.W.3d 288, 291 (Tenn. 2004); *Blair,* 130 S.W.3d at 763. Those requirements are that the filings supporting the motion show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Blair*, 130 S.W.3d at 764.

The moving party has the burden of demonstrating it is entitled to judgment as a matter of law and that there are no material facts in dispute. *Martin*, 271 S.W.3d at 83; *McCarley v. West Quality Food Service*, 960 S.W.2d 585, 588 (Tenn. 1998). To be entitled to summary judgment, a defendant moving party must either (1) affirmatively negate an essential element of the non-moving party's claim or (2) show that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1, 9 (Tenn. 2008). If the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of a genuine issue of material fact. *Martin*, 271 S.W.3d at 84; *Hannan*, 270 S.W.3d at 5; *Staples v. CBL & Associates*, 15 S.W.3d 83, 86 (Tenn. 2000) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

In our review, we must consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we must afford that party all reasonable inferences. *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001).

The State does not contend there are any material facts in dispute. Instead, the State disagrees with Level 3's characterization of its services as "access" to the Internet. The State contends Level 3 does not provide "access" to the Internet, but that Level 3 provides a transmission link and contends the true object of its services was the "ability to communicate."

The Tennessee Supreme Court recently reiterated the applicable principles for statutory interpretation:

> Statutory construction is a question of law that is reviewed *de novo* without any presumption of correctness. *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn.2009). When dealing with statutory interpretation, well-defined precepts apply. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008). Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose

-7-

and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006).

*Estate of French v. Stratford House*, 333 S.W.3d 546, 554 (Tenn. 2011).

Statutes imposing a tax should be construed strictly against the government and liberally in favor of the taxpayer. *Sky Transpo, Inc. v. City of Knoxville*, 703 S.W.2d 126, 129 (Tenn. 1985); *Prodigy Serv. Corp. v. Johnson*, 125 S.W.3d 413, 416 (Tenn. Ct. App. 2003). "Tax statutes 'will not be extended by implication beyond the clear import of the language used, nor will their operation be enlarged so as to embrace matters [or persons] not specifically named or pointed out.'" *Id.* (quoting *National Gas Distributors, Inc. v. State*, 804 S.W.2d 66, 67 (Tenn.1991)). Our primary goal is to determine the Legislature's purpose and intent in passing the statute at issue. *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 83 (Tenn. 2001).

### IV. TELECOMMUNICATION SERVICES

Telecommunications and telecommunication services that fit the definitions set forth in Tenn. Code Ann. § 67-6-102(a)(32), as quoted earlier in this opinion, are subject to the Tennessee sales tax for the relevant period. The State contends Level 3's services fit the definition of taxable "telecommunication services" in effect between 2001-2004 because Level 3's services provided "communication by electric or electronic transmission of impulses" and "transmission by or through any media, such as wires, cables, microwaves, radio waves, light waves, or any combination of those or similar media." As the trial court noted, however, it is important to consider what the Legislature explicitly included as taxable in subsection (C) of § 67-6-102(a)(32), and what it explicitly excluded from taxation in subsection (D) of that provision, to determine whether Level 3's services fit the definition of "telecommunications" or "telecommunication transmissions," as that term is used in subsection (C).

The list of "telecommunication transmissions" the statute includes in subsection (C) does not include the services Level 3 provides. The transmissions excepted from the definition of "telecommunications" in subsection (D) do not include those provided by Level 3, either. The language used in subsection (D) suggests a legislative intent to exclude from the definition, and thus from taxation, services offered for public consumption. On the other hand, subsection (D) carves out "specific telecommunication services" that a business

separately charges its customer as falling within the definition, and being taxable. Ultimately, we must determine whether Level 3's services are properly characterized as taxable "telecommunications" when viewed in light of the case law and the language of the statute, taken as a whole.

When a company's activity does not easily fall into a clear category for tax purposes, Tennessee courts consider the "true object" or "primary purpose" of the company's business to determine whether the goods or services are taxable. *See Sky,* 703 S.W.2d at 129 (primary purpose of gondola chair was transportation and not amusement); *Thomas Nelson, Inc. v. Olsen*, 723 S.W.2d 621, 622 (Tenn. 1987) (true object of company's business of selling software was the selling of information, not the tangible personal property of tapes and cards). This test has been used to determine whether a company's services are taxable as "telecommunications." *See, e.g., Qualcomm Inc. v. Chumley*, 2007 WL 2827513, at \*4-5, 8 (Tenn. Ct. App. Sept. 26, 2007) (true object of company's OmniTRACS service was to determine location and load status of vehicles, not to transmit text messages); *BellSouth Telecomm., Inc. v. Johnson*, 2006 WL 3071250 (Tenn. Ct. App. Oct. 27, 2006) (true object of company's messaging system was to facilitate transmission of telephone communication and was thus taxable as telecommunication); *Equifax Check Servs., Inc. v. Johnson*, 2000 WL 827963, at \*4-5 (Tenn. Ct. App. June 27, 2000) (although telecommunications were used to transmit information to merchants, true object of service was information about customers, not telecommunication itself).

## A. *Prodigy Services Corp. v. Johnson*

The State and Level 3 agree that the Court of Appeals' decision in *Prodigy Services Corp. v. Johnson*, 125 S.W.3d 413 (Tenn. Ct. App. 2003)*,* determines the outcome of this case, but they disagree about how that opinion should be applied to the facts here. Prodigy Services Corporation was the taxpayer, and it provided its end-users with access to the Internet through a software program the end-users installed on their computers. This program allowed the end-users to access certain information contained on Prodigy's computer either in Tennessee or in New York, where Prodigy's main computers were located. The link between Prodigy's local computer and its main computers was through lines leased from common carriers or through services leased from other networks. Prodigy's software also provided a link to the Internet and allowed its end-users to send and receive e-mail. *Id.* at 415.

The *Prodigy* court noted that federal law distinguishes between regulated "basic services" and unregulated "enhanced services":

Throughout this opinion we use the FCC's terms "basic" and "enhanced" to distinguish between regulated common carrier communications services, which

consist largely of plain old telephone service (POTS), and unregulated data processing services which use the telephone network to convey information from remote computers to customers' terminals. In the FCC's formal terms, basic service is the offering of a "pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information." Final Decision, *In re Amendment of Section 64.702 of the Commission Rules and Regulations (Second Computer Inquiry)*, 77 F.C.C.2d 384, 420 (1980) (Computer II Final Decision). An enhanced service combines basic service with "computer processing applications [that] . . . act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information, or provide the subscriber additional, different or restructured information, or involve subscriber interaction with stored information." *Id.* at 387; *see also* 47 C.F.R. § 64.702(a)(1989). Database services, in which a customer dials a number to obtain access to stored information, such as Dow Jones News, Lexis, and "Dial It" sports scores, are examples of enhanced services.

*Prodigy*, 125 S.W.3d at 418-19 (quoting *California v. F.C.C.*, 905 F.2d 1217, 1223 n.3 (9th Cir. 1990)).[7] Based on the distinction between "basic" and "enhanced" services, the *Prodigy* court concluded that the services Prodigy provided were "enhanced"services and therefore did not come within the statutory definition of "telecommunications." *Prodigy*, 125 S.W.3d at 419.

The *Prodigy* court noted at the conclusion of its opinion that telecommunication services were not the "true object" of Prodigy's services. The court acknowledged that Prodigy's customers had to supply their own telephone service to the Prodigy computer and that Prodigy used telecommunication services to connect its local computer to the main computer in New York.[8] *Id.* However, although telecommunication services were used to connect Prodigy's customers to its main computer in New York, Prodigy was a consumer of telecommunications services rather than a provider. Despite the fact that some of Prodigy's programs allowed its customers to communicate through the Internet, the court concluded that

---

[7]The United States Supreme Court has clarified the meaning of "pure" or "transparent" transmission: "a communications path that enabled the consumer to transmit an ordinary-language message to another point, with no computer processing or storage of the information, other than the processing or storage needed to convert the message into electronic form and then back into ordinary language for purposes of transmitting it over the network – such as via a telephone or a facsimile." *Nat'l Cable & Telcomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 976 (2005).

[8] Prodigy was a consumer of telecommunications services, not a provider. The *Prodigy* court noted that. *Prodigy*, 125 S.W.3d at 419.

-10-

communication was an enhanced service and that telecommunications were not the true object of Prodigy's services. *Id.*

### B. Application of *Prodigy* to Level 3

Applying *Prodigy*'s definitions of "basic services" and "enhanced services" to Level 3's services, we conclude Level 3's services qualify as enhanced services. Level 3 did not provide plain old telephone service, nor did Level 3 offer "pure transmission capability over a communications path that was virtually transparent in terms of its interaction with information supplied by a customer." Level 3's services converted an end-user's data into IP, the language of computers, and then Level 3 used routers to place the subscribers' IP packets where they needed to be on the Internet using Level 3's backbone. Regardless of whether an end-user used a dial-up modem ((3)Connect Modem) or broadband ((3)CrossRoads) to connect with the Internet, Level 3 converted the end-user's information into IP packets and, using its routers and other hardware, enabled the end-user to access the Internet. Indeed, the *Prodigy* court identified "Internet access" as an example of an enhanced service that does not qualify as a telecommunication service. *Prodigy*, 125 S.W.3d at 419.

Turning to the "true object" or "primary purpose" of Level 3's services, we find the true object of the services was to provide access to the Internet, not to provide telecommunication services. (3)Connect Modem used telecommunication lines provided by LECs to an ISP's end-user that the end-user utilized to dial into Level 3's system, but the ultimate purpose and true object of the connection was to gain access to the Internet. Level 3 provided the necessary link between the ISPs (or large corporations) and the Internet. The only purpose of providing this link was to enable an end-user to reach the Internet, whether to access stored information or otherwise.

The State distinguishes Level 3's services from Prodigy's services by pointing out that Prodigy provided content to its end-users, whereas Level 3 provided no such content to its customers through either (3)Connect Modem or (3)CrossRoads. The State contends this distinction should cause us to reach a different result from the *Prodigy* court's decision in classifying Level 3's services. We disagree.

The *Prodigy* court defined "enhanced services" as the combination of basic service with computer processing applications to act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information, **or** provide the subscriber additional, different or restructured information, **or** involve subscriber interaction with stored information. The State does not dispute that Level 3 utilized LECs' transmission lines to connect with end-users for the purpose of acting on the format, code, and/or protocol of a subscriber's transmitted information by converting their data into IP, the language of

-11-

computers, and then used routers to get the subscriber's IP packets where they needed to go on the Internet. The State ignores the conjunction "or" in the definition of "enhanced services" by arguing Level 3's services must provide content to the end-user to qualify as enhanced.[9]

The State characterizes Level 3's services as providing a "communications pathway" rather than "Internet access." The State describes Level 3's (3)Connect Modem services as establishing the first segment of the communications path that linked the end-user's computer with Level 3's own communication infrastructure. Although we acknowledge that the Internet may involve a form of communication, we decline to find that providing Internet access, or even a component of Internet access, falls within the definition of "telecommunications" for purposes of the tax statute at issue. The FCC has recognized that "[e]nhanced services involve communications and data processing technologies . . . intertwined so thoroughly as to produce a form different from any explicitly recognized in the Communications Act of 1934." *In the Matter of Federal-State Joint Board on Universal Serv.*, 13 FCC Rcd. 11830 § 26 (Apr. 10, 1998). The FCC further noted that enhanced services cover a wide range of different services, including what might seem to be predominantly communications services. However, the FCC has taken the position that "enhanced services, which are offered over common carrier transmission facilities, were themselves not to be regulated . . . , no matter how extensive their communications components." *Id*. at § 27.

The State also contends that the "wholesale" Internet access Level 3 provides to its customers should not be treated as "Internet access," and be exempt from taxation, because the end-users could not access the Internet directly using Level 3's services; the end-users could only access the Internet by contracting with an ISP that "resold" Level 3's Internet access service to the end-user. The question is not whether Level 3 sells Internet access directly to an end-user, however; the question is whether Level 3's services are properly characterized as "telecommunications" as that term is used in the tax statute. Although Level 3 provided its customers with local phone numbers for the ISPs' (3)Connect Modem customers to use, Level 3 did not own or control the transmission lines the end-users utilized to dial into Level 3's system, Level 3 did not charge for the use of these lines, and these phone numbers were used only to connect to the Internet, not for telephone or other communicative purposes.

Interpreting Tenn. Code Ann. § 67-6-102(a)(32) liberally in favor of Level 3 and

---

[9]The FCC has defined the Internet as an information service and has indicated that the Internet is not a telecommunications service. *Gulf Power Co. v. F.C.C.*, 208 F.3d 1263, 1277 (11th Cir. 2000) (*overruled on other grounds by Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327 (2002)).

strictly against the State, we conclude the services Level 3 provided from January 2001 through March 2004 did not constitute taxable "telecommunications" or "telecommunication transmissions."

## V. CONCLUSION

The judgment of the trial court granting Level 3's motion for summary judgment is affirmed. Costs of this appeal shall be taxed to the appellant, Richard Roberts, Commissioner of Revenue, State of Tennessee.

_____
PATRICIA J. COTTRELL, JUDGE