# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 21, 2012 Session

# IBM CORPORATION v. REAGAN FARR, COMMISSIONER OF REVENUE, STATE OF TENNESSEE

### Appeal from the Chancery Court for Davidson County
### No. 092144I    Claudia Bonnyman, Chancellor

### No. M2012-01714-COA-R3-CV - Filed September 24, 2013

Commissioner of Revenue assessed Company a sales and use tax for its sale of a wide area network ("WAN") service during the period 1998 through 2003 on the basis that the service was a "telecommunication service" as that term is defined in Tenn. Code Ann. § 67-6-102(a)(32) (2003). Company denied its WAN constituted a taxable telecommunication service because users were limited to accessing information on geographically remote computers; the WAN did not allow its users to communicate with one another. Following motions for summary judgment, the trial court concluded the WAN service was a taxable telecommunication service. Company appealed, and we reverse the trial court's judgment. The primary purpose of the WAN was to enable a company's authorized users to access information related to the company's business, not to provide communication between users. The fact that Company itself did not provide information does not alter the result.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Michael Dudley Sontag, Stephen John Jasper, and Ashley Nation Bassel, Nashville, Tennessee, for the appellant, IBM Corporation.

Robert E. Cooper, Jr., Attorney General and Reporter, William E. Young, Solicitor General, and Jonathan N. Wike, Assistant Attorney General, for the appellee, Reagan Farr, Commissioner of Revenue, State of Tennessee.

## OPINION

### I. BACKGROUND

In this case we are asked to determine whether a wide area network ("WAN") service that IBM Corporation ("IBM") provided to Tennessee customers from January 1, 1998, through December 31, 2003, constituted sales of taxable "telecommunication services" as that term was used in the applicable sales and use tax statute, Tennessee Code Annotated §67-6-102(a)(32) (2003). IBM did not collect or remit any sales and use tax for its sales of the WAN services during this period. Following an audit by the Tennessee Department of Revenue, the Department sent IBM a Notice of Assessment in February 2006 for an amount in excess of $5.5 million. IBM conferred with the Department in an effort to convince them that its WAN did not constitute a taxable telecommunications service, but the Department maintained its position that IBM's sales of WAN services were taxable.

IBM filed a complaint against the Tennessee Commissioner of Revenue (the "State") in which it asked the court to invalidate the assessment and award IBM its attorneys' fees consistent with Tenn. Code Ann. § 67-1-1803(d). Both parties moved for summary judgment, and following a hearing the trial court granted the State's motion, upholding the tax assessment, and awarded the State its attorneys' fees. IBM appeals the trial court's judgment, arguing the trial court erred in ruling its WAN service was a form of telecommunications because the WAN only provided its customers the ability to access information; it did not include any communication functions using voice, text messaging, e-mail, or otherwise.

The following facts are not in dispute. IBM provided a WAN service to a number of business customers in Tennessee during the relevant period. The WAN was a technological infrastructure that linked the customers' geographically-separated computers in such a way that information stored on those computers could be accessed remotely. The physical infrastructure was comprised of routers, switches, data service units, dedicated converters, circuits, transmission lines, and line monitors. The center, or hub, of the WAN infrastructure was usually at a data center where a mainframe computer was located, and each location that was connected to the WAN had an endpoint on the infrastructure. IBM's customers connected to the WAN by using a telephone line and computer, and once connected, the customers could access information related to the customer's business that was stored on geographically remote computers dedicated to the WAN.

IBM managed and operated the technological infrastructure making up the WAN and charged its customers fees for their use of the WAN. IBM's WAN customers paid a fixed fee for the service based on the number of locations the customer had that were connected

to the WAN. Authorized users of the WAN service could retrieve information related to the customer's business, but users were not able to use the WAN service to communicate with other authorized users or with anyone else. The WAN service had no messaging capabilities whatsoever, whether through voice, text, e-mail, or other means.

Authorized users connected to the WAN using either a private phone line or a 1-800 dial-up modem.[1] IBM's customers acquired these phone lines or modems either from third-party providers, such as AT&T or Sprint, or from IBM. To the extent IBM provided its customers with a phone line to access the WAN, IBM purchased or leased the telephonic link from a third-party provider. Regardless of how IBM's customers accessed the WAN, the amount IBM charged its customers did not vary based on whether IBM or its customers provided the phone lines necessary to access the WAN.

Before a customer's data could be input and stored on a central computer dedicated to IBM's WAN, IBM changed the data to a format that could be transferred through the WAN's transmission lines through protocol converters and associated parts. At the receiving end, a device IBM designed, managed, and maintained as part of its WAN service converted the format of the data into a format the mainframe computer could recognize and store.[2]

Two of IBM's largest WAN service customers during the relevant period were Nissan and First Tennessee Bank ("FTB"). Nissan's main data center was located in Inglewood, Colorado, but information was also stored at each Nissan location that was connected to the WAN infrastructure. Authorized personnel at Nissan facilities used the WAN service to access information used in Nissan's day-to-day business. This information included financial information related to specific customers, configuration information for the assembly of particular vehicles, and availability of different types of inventory. The locations connected to the WAN included Nissan's corporate headquarters, regional offices, sales offices, manufacturing facilities, design facilities, and credit acceptance facilities.

FTB's mainframe computer was located in Memphis, Tennessee, and information was stored both there as well as other geographically-separated locations dedicated to the WAN service. Bank tellers, loan officers, and other FTB employees used the WAN to retrieve information related to specific customers and bank accounts necessary to carry out their day-to-day responsibilities. FTB's employees and customers relied on the information made

---

[1]The phone line used to connect an authorized user to the WAN was single-purpose and could not be used for voice or any purpose other than to connect the user's computer to the WAN.

[2]IBM converted the information into packets at the location where the information was input as well as at the location where the information was stored.

available through the WAN in the same way they would have relied on information contained in general ledgers, account logs, and other business records historically maintained in paper format at bank locations. FTB's customers also accessed information through the WAN whenever they used an FTB automatic teller machine.

## II. TRIAL COURT DECISION

The basis for the trial court's decision granting the State's motion for summary judgment was its finding that "what is being sold in the WAN service is the means of transmitting IBM's customers' information and not the means of transmitting information that IBM itself provided." The court wrote:

> The issue before this Court is whether IBM's sale of its WAN services to various business customers during the tax period at issue was a taxable sale of "telecommunication service" or the non-taxable provision of information. The Court finds that the IBM WAN service was a taxable "telecommunication service" as defined in Tenn. Code Ann. § 67-6-102(a)(32) (2003) because the service consisted of the provision of links and hubs that transmitted IBM's customers' own information from one point to another. Further, IBM did not provide any original information to its customers. What IBM was selling, therefore, was the means of transmitting its customers' information and not information that IBM itself provided. Thus, the "true object" of IBM's WAN was the provision of links and hubs that transmitted IBM's customers' information.

The trial court then determined that the facts of this case most closely resembled the facts of *Bellsouth Telecomms., Inc. v. Johnson*, 2006 WL 3071250 (Tenn. Ct. App. Oct. 27, 2006), even though the WAN carried data rather than voice communications. The court found "inconsequential" the distinction between the data transmitted via the WAN service and the voicemail transmitted via Bellsouth's services:

> The essential similarity between the WAN and voice mail, the "true object" of which was held in *Bellsouth* to be communication, derives from the fact that the purpose of both services, and the capability provided to customers by both services, was the "transmission and receipt" of the customers' own stored information.

IBM appeals the trial court's decision, arguing in essence that the true object of its WAN service is information, not communication, and that its WAN service is therefore not taxable as a telecommunication service.

-4-

### III. STANDARD OF REVIEW

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. West Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law. *Id.* Accordingly, this court must review the record *de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair,* 130 S.W.3d at 763. Those requirements are that the filings supporting the motion show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Blair*, 130 S.W.3d at 764.

The moving party has the burden of demonstrating it is entitled to judgment as a matter of law and that there are no material facts in dispute. *Martin*, 271 S.W.3d at 83; *McCarley v. West Quality Food Service*, 960 S.W.2d 585, 588 (Tenn. 1998). To be entitled to summary judgment, a defendant moving party must either (1) affirmatively negate an essential element of the non-moving party's claim or (2) show that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1, 9 (Tenn. 2008). If the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of a genuine issue of material fact. *Martin*, 271 S.W.3d at 84; *Hannan*, 270 S.W.3d at 5; *Staples v. CBL & Associates*, 15 S.W.3d 83, 86 (Tenn. 2000) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

In our review, we must consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we must afford that party all reasonable inferences. *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001). The parties do not contend there are any material facts in dispute. Instead, the State and IBM disagree about the characterization of IBM's WAN service and whether or not it satisfies the statutory definition of "telecommunication services" as that term is used in Tenn. Code Ann. § 67-6-102(a)(32) (2003).

The Tennessee Supreme Court recently reiterated the applicable principles for statutory interpretation:

> Statutory construction is a question of law that is reviewed *de novo* without any presumption of correctness. *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009). When dealing with statutory interpretation, well-defined precepts apply. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn.

2008). Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc*., 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc*., 202 S.W.3d 99, 102 (Tenn. 2006).

*Estate of French v. Stratford House*, 333 S.W.3d 546, 554 (Tenn. 2011).

Statutes imposing a tax should be construed strictly against the government and liberally in favor of the taxpayer. *Sky Transpo, Inc. v. City of Knoxville*, 703 S.W.2d 126, 129 (Tenn. 1985); *Prodigy Serv. Corp. v. Johnson*, 125 S.W.3d 413, 416 (Tenn. Ct. App. 2003). "Tax statutes 'will not be extended by implication beyond the clear import of the language used, nor will their operation be enlarged so as to embrace matters [or persons] not specifically named or pointed out.'" *Id*. (quoting *National Gas Distributors, Inc. v. State*, 804 S.W.2d 66, 67 (Tenn.1991)). Our primary goal is to determine the Legislature's purpose and intent in passing the statute at issue. *Limbaugh v. Coffee Med. Ctr*., 59 S.W.3d 73, 83 (Tenn. 2001).

## IV. TAXABLE TELECOMMUNICATION SERVICES

The parties agree that the statute applicable to the relevant time period was Tenn. Code Ann. § 67-6-102(a)(32) (2003), which provided as follows:

(A) "Telecommunication" means communication by electric or electronic transmission of impulses;

(B) "Telecommunications" includes transmission by or through any media, such as wires, cables, microwaves, radio waves, light waves, or any combination of those or similar media;

(C) Except as provided in subdivision (a)(32)(D), "telecommunications" includes, but is not limited to, all types of telecommunication transmissions, such as telephone service, telegraph service, telephone service sold by hotels or motels to their customers or to others, telephone service sold by colleges and universities to their students or to others, telephone service sold by hospitals to

their patients or to others, WATS service, paging service, and cable television service sold to customers or to others by hotels or motels;

 (D) "Telecommunications" does not include public pay telephone services, television or radio programs which are broadcast over the airwaves for public consumption, coaxial cable television (CATV) which is offered for public consumption, private line service, or automatic teller machine (ATM) service, wire transfer or other services provided by any corporation defined as a financial institution under § 67-4-804(a)(9) [repealed], unless the company separately bills or charges its customers for specific telecommunication services rendered.

IBM argues that its WAN service is limited to providing access to information and does not provide "communication." Therefore, IBM argues, the WAN service should not be taxed as a "telecommunication service." IBM relies on four cases interpreting the statute over the last twelve years to argue the Court of Appeals has consistently ruled that a service must have as its true object a means of communication, rather than simply access to information, to satisfy the definition of "telecommunications" or "telecommunication services" for purposes of the sales and use tax statute.

In *Equifax Check Servs., Inc. v. Johnson*, 2000 WL 827963 (Tenn. Ct. App. June 27, 2000), the taxpayer provided a check guarantee service whereby merchants could use a phone line to dial in to computers maintained by Equifax to access a customer's account information stored on the computers and determine whether a customer had sufficient funds in his or her account to cover a particular check. *Id.* at *1. Equifax charged its merchant customers a fee for its check approval services based on the check amounts; it did not itemize its invoices to show telecommunication costs or bill its customers separately for telecommunication costs. *Id.*

To determine whether Equifax's check services constituted taxable "telecommunication services," the Court of Appeals considered the purpose of the check guarantee service, which was to approve or decline checks written by the merchants' customers. The court explained, "Although this information was communicated via telecommunications, Equifax was not in the business of providing telecommunication services to the merchants. . . . [T]he telecommunications used to convey this information had no value to the merchant separate and apart from the check guarantee services provided by Equifax." *Id.* at *3. The court continued, "the true object of the transactions was not telecommunication services, but the information itself. Although Equifax admittedly relied upon the telecommunications to transmit the information, telecommunications were not required for

-7-

the information to exist." *Id*. at *4. Thus, the *Equifax* court held, the check guarantee service was not taxable as a telecommunication service.

The next case IBM relies on is *Prodigy Servs. Corp., Inc. v. Johnson*, 125 S.W.3d 413 (Tenn. Ct. App. 2003), wherein the Court of Appeals held that services providing access to information available on the Internet did not constitute taxable telecommunication services. The taxpayer Prodigy provided its customers access to the Internet through a software program the customers installed on their computers. This program allowed the customers to access certain information contained on Prodigy's computer either in Tennessee or in New York, where Prodigy's main computers were located. The link between Prodigy's local computer and its main computers was through lines leased from common carriers or through services leased from other networks. Prodigy's software also provided a link to the Internet and allowed its end-users to send and receive e-mail. *Id.* at 415.

The *Prodigy* court noted that even though Prodigy used telecommunication services to tie its local computer to its main computer in New York, Prodigy was not a provider of the telecommunication services. *Id.* at 419. Distinguishing between "basic" telecommunication services, such as telephone, telegraph, WATS, and paging services, and "enhanced" services, such as information services, conversion services, computer services, and Internet access, the court found that basic services were taxable telecommunications whereas enhanced services were not. *Id.* at 418-19. The court then considered the "true object" of Prodigy's services and determined that telecommunication services were not the true object of Prodigy's services even though some of its services fit that definition. *Id.* at 419.

The third case IBM relies on is *Qualcomm Inc. v. Chumley*, 2007 WL 2827513 (Tenn. Ct. App. Sept. 26, 2007). The taxpayer Qualcomm provided commercial trucking companies a service it called OmniTRACS whereby the trucking companies could locate and determine the load status of trucks in their fleets as well as communicate with their drivers. *Id.* at *1. Qualcomm leased transponder space on two satellites that served as the link between individual trucks and Qualcomm's network operations center. Qualcomm collected the data from the satellites, processed it at its operations center, and then sent the data to a queue where customers could access the information through the customers' own internet connections.[3] *Id.* at *1-2. The OmniTRACS service also allowed text messages to be sent to and from vehicles by way of the network operations center. *Id.* at *2.

---

[3]The court noted that Qualcomm arranged connections to its network operating center for a few customers by providing the landline or internet service, but that this did not affect its ultimate decision. *Id.* at *2 and n.1.

-8-

Recognizing that Qualcomm's service did not easily fit within the definitions of the sales and use tax statute, the Court of Appeals considered the true object of the OmniTRACS service, which was to determine the location and load status of Qualcomm's customers' trucks, or collecting data and making this information available to Qualcomm's customers. *Id.* at *4, 8. Although the OmniTRACS service also included the ability to send and receive text messages, the court found this communication was not the primary purpose of the service: "The fact that a service might employ, involve, or be accessed by telecommunications, without more, will not transform it into a taxable telecommunications service." *Id.* at *8 (citing *Prodigy*, 125 S.W.3d at 419; *Equifax*, 2000 WL 827963, at 83).

As the State argues here, the State argued in *Qualcomm* that the OmniTRACS service should be considered a form of taxable telecommunications because Qualcomm did not create the information being transmitted.[4] The *Qualcomm* court rejected this argument, explaining that "a distinction based upon the creator of the content cannot trump inquiry into the true object of a potentially taxable service." *Id.* at *9.

The final case IBM relies on is *Bellsouth Telecomms., Inc. v. Johnson*, 2006 WL 3071250 (Tenn. Ct. App. Oct. 27, 2006). In that case the Court of Appeals determined the services at issue were taxable as telecommunication services. The taxpayer Bellsouth sold voice messaging services that allowed its customers to receive voice mail messages, receive pages notifying them of new messages, mark messages as urgent, exchange information through messaging with other subscribers to the service, and control the future delivery of messages. *Id.* at *3. Bellsouth charged its customers for communicating with another person using telecommunication transmissions, and the Court of Appeals found the true object of these services was to facilitate the transmission and receipt of a telephone communication. *Id.* at *1, 3. The court explained that just because an "oral message is held in abeyance in a computer memory does not change the service provided, that is, the customer can communicate with a specific person or persons through telephonic means." *Id.* at *3.

IBM points out that unlike the services at issue in *Bellsouth*, users of its WAN service were not able to communicate with other users. Because communication between users was not the true object of its service, as it was in *Bellsouth*, IBM argues that its WAN service was not taxable as a telecommunication service. IBM argues the trial court erred by focusing on the transmission quality of its WAN service, and that the trial court's decision should have turned on whether or not the transmission permitted IBM's users to communicate with one another.

---

[4]The taxpayer in *Prodigy* created the information that was available to its customers, whereas Qualcomm did not create any of the information transmitted through its service.

We agree and conclude the trial court erred in finding IBM's WAN service constituted a telecommunication service for purposes of Tenn. Code Ann. § 67-6-102(a)(32) (2003). As the Court of Appeals made clear in the *Equifax*, *Qualcomm*, and *Prodigy* decisions, the issue of whether a service is taxable as a telecommunication service does not turn on whether or not a service provides the transmission of information, but whether communication between users of the service was the primary purpose of the service. The services at issue in each of those cases included the transmission of information, and the services in *Qualcomm* and *Prodigy* even included some communication between users. The court in each of those cases, however, determined that communication was not the "true object" of the service, and that the service therefore was not taxable as "telecommunication services."

The State argues here, as the State argued in *Qualcomm*, that IBM's WAN service is a taxable telecommunication service because IBM did not create the content that it transmitted to its customers. As noted above, the *Qualcomm* court rejected this argument, stating that "a distinction based upon the creator of the content cannot trump inquiry into the true object of a potentially taxable service." *Qualcomm*, 2007 WL 2827513, at *9. Moreover, the information users were able to access in *Prodigy* was not limited to that provided by Prodigy, yet Prodigy's services were not found to be taxable telecommunication services. Both IBM's WAN service and Prodigy's Internet access service connected geographically separated computers and allowed users to access information stored on those remote computers. IBM's WAN service should not be treated differently for tax purposes from the services at issue in *Prodigy*, especially since Prodigy's service permitted users to communicate with one another and IBM's WAN service did not.

### V. CONCLUSION

For the reasons stated above, we conclude the trial court should have granted IBM's motion and denied the State's motion for summary judgment. Accordingly, we reverse the trial court's judgment denying IBM's motion for summary judgment, and we reverse the trial court's judgment granting the State's motion for summary judgment and awarding it attorneys' fees. Judgment is granted to IBM.

Costs of appeal are assessed against the appellee, Reagan Farr, Commissioner of Revenue, State of Tennessee.

_____
PATRICIA J. COTTRELL, JUDGE